UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
In re:

BIORESTORATIVE THERAPIES, INC.,

                           Debtor.
-----------------------------------------------------------x

Chapter 11

Case No.: 8-20-71757

## DECLARATION OF MARK WEINREB UNDER LOCAL RULE 1007-4 IN CONNECTION WITH CHAPTER 11 FILING, AND LOCAL RULE 9077-1 IN SUPPORT OF CERTAIN "FIRST DAY" MOTIONS

**MARK WEINREB** declares under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1.     I am the Chief Executive Officer of and Authorized Signatory for BioRestorative Therapies, Inc. ("BRT," "we," the "Company" or the "Debtor"), the above-captioned debtor and debtor in possession.

2.     On March 20, 2020 (the "Petition Date") the Debtor filed a voluntary petition for relief under chapter 11, title 11, United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Eastern District of New York (the "Court").

3.     I submit this declaration under Rules 1007-4 and 9077-1 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Eastern District of New York, in support of the Debtor's voluntary petition for relief under chapter 11 of the Bankruptcy Code and certain "first day" motions described in more detail below.

### Debtor's Business and Operations

4.     The Company is a publicly traded corporation organized under the laws of the State of Delaware. BRT was originally incorporated under the laws of the State of Nevada on June

13,1997, under the name "Stem Cell Assurance, Inc." which name was changed to "BioRestorative Therapies, Inc." on August 15, 2011. Thereafter, BRT re-incorporated in Delaware.

5. BRT develops therapeutic products and medical therapies using cell and tissue protocols, primarily involving adult stem cells. It is currently pursuing its *Disc/Spine Program* with an initial investigational therapeutic product called *BRTX-100*. In February 2017, the Debtor received authorization from the Federal Drug Administration (the "FDA") to commence a Phase 2 clinical trial investigating the use of *BRTX-100*, the Debtor's lead cell therapy candidate, in the treatment of chronic lower back pain arising from degenerative disc disease. Prior to the bankruptcy filing, we intended to commence such clinical trial and made numerous attempts at raising sufficient funding in order to start such trial. The funding necessary to start that trial is approximately $10MM – 12MM with additional substantial funding necessary to complete it. The Debtor has not been able to raise those funds and does not anticipate raising them at this point.

6. In developing *BRTX-100*, BRT obtained a license to use patent-pending technology for investigational adult stem cell treatment of disc and spine conditions, including protruding and bulging lumbar discs. The technology is an advanced stem cell injection procedure that may offer relief from lower back pain, buttock and leg pain, and numbness and tingling in the leg and foot. Moreover, that license also includes a patented investigational curved needle device that is a needle system designed to deliver cells and/or other therapeutic products or materials to the spine and discs. Also as part of that license, the Debtor sublicenses a part of the licensed intellectual property back to the licensor which results in yearly revenues ("Cash Collateral") which in 2019 totaled $130,000. All other monies necessary for the operations of the Debtor have come through debt and/or equity financings throughout the years.

7.      We are also developing our *ThermoStem Program*. This pre-clinical program involves the use of brown adipose (fat) in connection with the cell-based treatment of type 2 diabetes and obesity as well as hypertension, other metabolic disorders and cardiac deficiencies. Patents related to the *ThermoStem Program* were issued, or are scheduled to be issued, to BRT by (i) the United States in September 2015, January 2019 and March 2020; (ii) Australia in April 2017 and October 2019; (iii) Japan in December 2017; and (iv) Israel in August 2019. Additionally, a patent from the European Union will issue in the near future.

8.      At this time, the senior management of the Debtor is comprised of Mandy Clyde, Vice President of Operations and Secretary, Robert Paccasassi, as Vice President of Quality and Compliance, Francisco Silva, as Vice President of Research and Development, and me, as Chief Executive Officer.

9.      The board of directors of the Debtor (the "Board") is currently comprised of Robert B. Catell, A. Jeffrey Radov, Paul Jude Tonna and myself, with Messrs. Catell, Radov and Tonna being "independent directors" based on the definition of independence in Listing Rule 5605(a)(2) The Nasdaq Stock Market and Rule 10A-3(b)(1) under the Exchange Act.

10.     The Debtor has a wholly owned subsidiary, Stem Pearls, LLC, which has no operations and is not filing for bankruptcy protection at this time.

**Pre-Petition Secured Loans with
John Desmarais and Tuxis Trust**

11.     In June 2016, BRT borrowed $500,000 from Tuxis Trust ("Tuxis"), a trust for which John M. Desmarais ("Desmarais," and collectively with Tuxis, the "Pre-Petition Secured Creditors") and his wife serve as the trustees and which was established for the benefit of Mr. Desmarais's immediate family.  The promissory note evidencing that loan (the "Tuxis Note") provided for the payment of the principal amount, together with interest at the rate of 10% per

annum, in July 2017 and is secured by BRT's intellectual properties and equipment (the "Tuxis Collateral"). Over time, the Tuxis Note has been amended several times with its maturity date extended through and including January 31, 2020, and per annum interest rate increased to 15%.

12. In July 2017, we borrowed $175,000 from Desmarais. The promissory note evidencing the loan (the "Desmarais Note") provided for the payment of the principal amount, together with interest at the rate of 15% per annum, on December 1, 2017. The payment of the Desmarais Note is also secured by the grant of a security interest in the Tuxis Collateral. Over time, the Desmarais Note has been amended several times with its maturity date extended through and including January 31, 2020.

13. A copy of the Debtor's most recently filed Form 10-Q for the period ended September 30, 2019 contains additional details concerning the foregoing borrowings from Desmarais and Tuxis and is annexed hereto as **Exhibit A**.

14. In December 2019, Desmarais and Tuxis respectively granted BRT a further extension of the maturity dates of the Tuxis Note and the Desmarais Note through and including January 31, 2020. The Tuxis Note and the Desmarais Note both matured on January 31, 2020 and, to date, The Pre-Petition Secured Creditors have forebared from collecting on or enforcing any default on those notes.

15. The current amount due on the Tuxis Note is approximately $753,835.00, including interest, and on the Desmarais Note is approximately $245,191.78, including interest.

16. At the time the Company issued the Tuxis Note and the Dsmarais Note, Desmarais was a director of the Company. As a result of the Tuxis Note and the Desmarais Note, Desmarais (individually and through Tuxis) became a first priority secured creditor of the Company, which

he remains to this day. He is also a shareholder of the Company. On January 10, 2020, Desmarais resigned from the Board.

Borrowing in Contemplation of Bankruptcy Filing

17. In February 2020, BRT entered into two term sheets with Desmarais, one (the "DIP Term Sheet") to borrow additional money from Desmarais or an entity created by and owned by him (the "DIP Lender") and one (the "Sale Term Sheet") to enter into a definitive asset purchase agreement with him to purchase substantially all of BRT's assets (the "Sale"), with that sale to be conducted under and occur through a § 363 sale process in a chapter 11 filing. The borrowing was for the purpose of funding BRT's operations, first through February 2020, and thereafter (the "DIP Loan Facility") to fund its operations and administrative costs for 13 weeks during the chapter 11 case under an approved 13 week budget (the "DIP Budget").

18. Between February 20, 2020 and February 26, 2020, BRT borrowed an aggregate principal amount of $353,761.99 from the proposed DIP Lender. The promissory notes evidencing those loans (the "February Bridge Notes," and collectively with the Tuxis Note and the Desmarais Note, the "Existing Notes") provide for the payment of the principal amount, together with interest at the rate of 12% per annum, upon demand by Desmarais on or after March 10, 2020. That maturity date was extended to March 19, 2020, and the February Bridge Notes have now matured. The payment of those notes is secured by the grant of a security interest in substantially all of the Company's assets (inclusive of and collectively with Tuxis Collateral, the "Pre-Petition Collateral") pursuant to a security agreement between BRT and Desmarais, as amended.

19. In connection with the filing of the Debtor's case, the Debtor is filing a motion seeking authority to enter into the DIP Loan Facility (the "DIP Motion"). As set forth below, I

believe there are strong and cogent reasons why the Court should grant that motion and other "first day" motions.

## Pre-Petition Convertible Note Debt

20. In addition to the monies borrowed pre-petition from the Pre-Petition Secured Creditors, BRT issued a number of promissory notes convertible into equity in BRT as a way to raise funds necessary to continue the company as a going concern while it sought a substantial investment sufficient to begin Phase 2 clinical trials on *BRTX-100*. None of those convertible notes are secured. The terms of those convertible promissory notes are substantially similar whereby each has a maturity date and accrues interest at a fixed rate, with the lender able to elect to convert such loan or portions of such loan into equity in the form of BRT common stock (i) in certain cases for an agreed upon dollar amount per share during the first 180 days after issuance, and/or (ii) thereafter, at a conversion price equal to a set percentage discount off of fair market value of BRT's common stock. There are currently 30 of such noteholders holding outstanding convertible promissory notes with an aggregate balance of approximately $10,101,493.00, including accrued interest.

## Reasons for Filing

21. The primary reason for the Debtor's bankruptcy filing is to conduct a public sale of its assets under § 363 of the Bankruptcy Code. In furtherance of that goal, the DIP Lender and the Debtor have entered into a stalking horse asset purchase agreement (the "APA"), subject to approval by the Court and higher or better offers. The Debtor arrived at this path because it has been unable to secure investment sufficient to commence the Phase 2 trials for *BRTX-100* (since February 2017), continue general operations, including its inability to meet payroll obligations, pay rent (now 4 months in arrears) and pay its vendors and outside professionals. In addition, the

Company does not have the financial resources to meet certain public company activities and filings, such as our submission of our audited Form 10-K filing for the year ending December 31, 2019. Moreover, the Existing Notes have all matured and the Debtor lacks the financial wherewithal to satisfy those notes.

22. After weighing all of its options and having no funds available to it other than that offered by Desmarais (as discussed below), the Debtor (i) issued the February Bridge Notes; (ii) entered into the DIP Loan Facility, subject to the approval of this Court; and (iii) entered into the APA, subject to the approval of this Court and higher or better offers, all in contemplation of commencing a Chapter 11 case for the purpose of selling substantially all of its assets through a § 363 sale process.

## Assets and Liabilities

### Assets

23. As of the Petition Date, the Debtor owned assets worth approximately $929,062.00 of book value which are comprised primarily of: (i) patents, trademarks and other intellectual property; (ii) various populations of human cell lines; (ii) lab equipment; and (iv) office furniture and computers and equipment, excluding net operating losses. The Debtor's assets, as well as its books and records, are located at the Debtor's premises located at 40 Marcus Drive, Suite One, Melville, New York, which the Debtor leases. The Debtor also has cell lines in laboratories at the University of Utah in Salt Lake City, Utah and the University of Pennsylvania in Philadelphia, Pennsylvania, with the Debtor having agreements with those outside labs for research and testing.

24. All assets are currently encumbered by a blanket collateral security interest in favor of the Pre-Petition Secured Creditors.

25. At this time, except as described herein, no property of the Debtor is in the possession or custody and control of any public officer, receiver, trustee or assignee for the benefit of creditors.

**Liabilities**

26. As of the Petition Date, exclusive of payroll obligations, the Debtor's liabilities were approximately $15,082,871. The Debtor's liabilities, exclusive of employee related obligations, are comprised of (i) the Tuxis Note in the amount of $753,836.00; (ii) the Desmarais Note in the amount of $245,192.00; (iii) the February Bridge Notes in the amount of $356,836.00; (iv) convertible promissory note debt held by non-insiders, in the aggregate amount of $10,101,493.00, including accrued interest; (v) convertible promissory note debt held by current insiders, in the aggregate amount of $156,542.00; non-convertible promissory note debt, excluding the debt from the Tuxis Note, the Desmarais Note and the February Bridge Notes, in the aggregate amount of $481,050.00, (v) rent and additional rent arrears to BRT's landlord through March 31, 2020 in the amount of $50,686.00; (vi) unpaid amounts under a services agreement concerning an ongoing research study in the amount of $15,409.00; and (vii) other unsecured trade debt and other operating debt totaling approximately $2,921,827.

27. As of the Petition Date, the Debtor owed its non-officer employees' salaries of approximately $13,333.00, and officers $43,260.00 for the most recent pay period running from March 1, 2020 through and including March 15, 2020. Thus, the total payroll accrued but unpaid as of the Petition Date totals approximately $60,923.00, inclusive of the associated taxes to be withheld from the employees or otherwise paid by the employer. Additionally, the Debtor owes its employees and officers for expense reimbursements, pre-petition severance claim, unused vacation time and unpaid salary totaling approximately $210,783.00

28.     The Debtor's primary expenses are wages, salaries, lab and research and development costs, professional fees for intellectual properties, insurance, rent, and other operating expenses.

### Projected Four Week Revenues and Expenses

29.     Anticipated revenues for the first four (4) weeks of the case should total approximately $0.00.  Accordingly, the only source of funds necessary to maintain the minimum amount of operations will be from borrowing under the DIP Loan Facility.

30.     The Debtor estimates that its general operating expenses for the first four (4) weeks of the case will total approximately $688,399, including, wages, salaries, lab and research and development costs, professional fees for intellectual properties, insurance, rent, other operating expenses and the premium for an extension of the Debtor's Directors and Officers Insurance Policy with wind down coverage and six years of tail coverage.

31.     The Debtor intends to liquidate its assets through a § 363 sale process in chapter 11. The relief sought by the Debtor at this time merely preserves the status quo as it existed immediately prior to the Petition Date.

32.     The Debtor believes that with the protection of this Court, it will be able to preserve its business as a going concern through a Sale and thereafter wind down the company through a feasible and confirmable plan in order to distribute the Debtor's proceeds from the Sale to its creditors.  The Debtor has not yet determined the form and mechanics of such plan, but it may include, if warranted, the creation of a trust to hold and prosecute any claims the Debtor may have under Chapter 5 of the Bankruptcy Code or other applicable bankruptcy and non-bankruptcy law (to the extent not otherwise included in the Sale).

**The First Day Motions**

33.     On the Petition Date, the Debtor filed certain "First Day" motions seeking emergency relief. As set forth below, I believe that obtaining the relief requested in each of the First Day motions is critical to avoid irreparable harm to the Debtor, its business, and its prospects for maximizing the value of its business as a going concern.

**Motion to Pay Certain Pre-Petition Date Wages,
Salaries, and Related Employee Benefits, and Directing
the Bank to Honor Employee Wage and Salary Checks**

34.     The Debtor has filed a motion seeking authority to pay certain pre-Petition Date wages, salaries, and related benefits (the "Wage Motion") which is critical because (i) the Debtor's employees have already provided the services for which they are entitled to payment and (ii) they may stop working if they are not timely paid.

35.     The Debtor has 7 employees (each, an "Employee" and collectively, the "Employees"), of which all are salaried and operate out of the Debtor's premises at 40 Marcus Drive, Melville, New York which the Debtor leases. Four of the Employees are officers of the Debtor: Mandy Clyde, Vice President of Operations and Secretary, Robert Paccasassi, as Vice President of Quality and Compliance, Francisco Silva, as Vice President of Research and Development, and me as Chief Executive Officer. The other three employees work in the Debtor's lab facility maintaining that facility and engaging in research and development. Salaries, wages, and benefits are paid to Employees on the last day and the 15th day of each month, with payment made on either the last day or 15th day of the month or the first business day immediately prior to such dates. The accrued wages, salaries, commissions and/or benefits are for services rendered by the Employees for the period March 1, 2020 through and including March 15, 2020 (the "Accrued Period"). Amounts due for the Accrued Period to Employees were due to be paid by the Debtor

on March 13, 2020. This Motion seeks the authorization to pay them now upon approval by the Court.

36. The motion seeks to pay accrued pre-Petition Date wages and benefits to employees in amounts which do not exceed the priority limits set forth in Bankruptcy Code § 507(a)(4), which is currently $13,650 per employee. In addition, the motion seeks entry of an order directing Paychecks or the Debtor's bank to honor employee wage and salary checks drawn on the Debtor's payroll account.

37. As of the Petition Date, the Debtor owes approximately $60,923.19 to its Employees for accrued but unpaid wages and benefits during the Accrued Period.[1] The amounts accrued by each Employee for the Accrued Period are detailed in Exhibit A annexed to the Wage Motion.

38. The Company has a bi-monthly pay period, with the most recent period being from March 1, 2020 to March 15, 2020 with payroll for that period to be made on March 13, 2020 (the 13th is the first business day prior to the pay period date, which falls on a non-banking day). As of the Petition Date, the Debtor owes approximately $13,333.00 to its employees for accrued but unpaid wages and benefits, and $43,260.00 to its officers, inclusive of withholding taxes and employer taxes. No employee or officer is owed more than $13,650.00 for salaries accrued but unpaid within the past 180 days, except for myself. At this time, I am seeking only to be paid my earned salary for the most recent pay period.

---

[1] The Employee claims set forth in this Motion are not listed on the Debtor's Schedules as creditors because, if this Application is approved, all of the requested wage claims will be paid in full. Some Employees have separate claims for unreimbursed expenses, accrued but unused vacation, and unpaid salaries. Those claims are listed on the Debtor's Schedules. In the event any Employee claims are not approved for payment under the Motion, the Debtor will amended its Schedules to include such claims, and provide additional notice to such creditors as required under the Bankruptcy Code, Bankruptcy Rules, and/or Local Rules.

39. I believe that there are strong and cogent reasons why the relief requested ought to be granted. Without such relief requested, the Employees and their families would suffer a tremendous hardship since it is believed that they live paycheck to paycheck. It is respectfully submitted that any delay in paying the Employees' compensation will also severely disrupt the Debtor's relationship with its Employees, and irreparably harm and/or impair their morale at a time when their dedication, confidence and cooperation is critical. The Debtor cannot be sure that the Employees will continue working, which will make it impossible for the Debtor to continue operations. Those critical operations include maintaining the Debtor's lab facility, continuing research and development on the Debtor's therapeutic products and medical therapies, oversee an ongoing research study in Utah, and provide information and otherwise assist in the preparation of various filings to obtain new and protect existing intellectual properties. Additionally, the remaining Employees have institutional knowledge that is anticipated to be critical during the sale process and the conduct of this case.

40. Moreover, the DIP Lender and stalking horse offeror for the assets of the Debtor, has agreed to include the full amounts sought to be paid in this Wages Motion in the DIP Budget in order to keep operations going until a closing on such sale.

41. Indeed, if the Employees are not paid their salaries and wages, they will have little incentive continue to work for the Debtor and will seek to find employment elsewhere. If the relief requested herein is not granted, the success of the sale process and this case would undoubtedly be put in jeopardy. Chapter 11 is designed to afford debtors the opportunity to reorganize and rehabilitate as well as to engage in an orderly liquidation, which is what is occurring here. Unless the relief requested herein is granted, the Debtor may be deprived of that opportunity. For the

reasons set forth herein, the Debtor submits that granting this Motion is in the best interests of the Debtor, its creditors and its estate.

## Motion Authorizing the Entry into the DIP Loan Facility Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 on an Interim and Final Basis

42. The DIP Motion seeks the entry of an interim order (the "Interim Financing Order") and a final order (the "Final Financing Order," and collectively, the "DIP Orders") authorizing and approving the terms and conditions under which the Debtor may enter into the DIP Loan Facility to borrow funds from the DIP Lender and use same along with any cash collateral, to the extent collected, of the Pre-Petition Secured Creditors, and schedule a preliminary and final hearing thereon. Approval of the DIP Loan Facility is essential to the Debtor's continued operations while under bankruptcy protection, and dovetails with all of the other relief sought, as detailed herein.

43. The proposed DIP Loan Facility is a senior secured superpriority term credit facility with Phoenix Cell Group Holdings, LLC as the DIP Lender, whose sole member is Desmarais, comprised of (a) a multi-draw loan in the aggregate principal amount of $1,424,273.37 (the "New Money DIP Loan") and (b) subject to entry of the Final Order, in connection with the funding of the New Money DIP Loan, a roll up loan facility for the Existing Loans (the "Roll-Up DIP Loan Facility"), pursuant to which the DIP Lender shall be deemed to make loans under the Roll-Up DIP Loan Facility (such loans, the "Roll-Up DIP Loans" and, together with the New Money DIP Loan, the "DIP Loans"), all of which are evidenced by that certain promissory note made and issued by the Debtor in favor of the DIP Lender (the "DIP Note"), in an aggregate principal amount equal to (i) the New Money Dip Loan plus (ii) the Existing Loans[2] (including accrued interest and fees due thereunder), pursuant to the terms and conditions of that certain *DIP Loan and Security*

---

[2] Existing Loans are defined in Section 1.1(u) of the DIP Credit Agreement, and are listed in Section F(1), on pages 6-7, of the proposed Interim Order.

*Agreement* (as the same may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "DIP Credit Agreement" (a copy of the DIP Credit Agreement is annexed to the Debtor's motion seeking approval of the DIP Loan Facility as Exhibit B thereto) and, together with the schedules and exhibits attached thereto and the DIP Note, all agreements, documents, instruments, and amendments executed and delivered in connection therewith, the "DIP Documents"), by and among the Debtor and the DIP Lender.

44. The proceeds of the New Money DIP Loan portion of the DIP Loan Facility will be used to fund in accordance with the DIP Budget (a) working capital and general corporate purposes of the Debtor, which shall include the renewal or extension of the Debtor's existing director's and officer's liability insurance policy and tail coverage therefor in amounts specified in the DIP Budget, (b) United States Trustee fees, (c) Court approved professional fees and other administrative expenses arising in the Chapter 11 Case, (d) costs related to the Sale, and (e) interest, fees, costs and expenses incurred in connection with the DIP Loan Facility (including professional fees) due under the DIP Loan Documents and expenses incurred by the DIP Lender as provided by the DIP Term Sheet and the DIP Loan Documents (in each case under this subsection (e), whether or not such amounts are reflected in the DIP Budget).

45. The DIP Loan Facility provides that $750,000 will be advanced to the Debtor within no more than twenty-four (24) hours of the entry of an Interim Financing Order by the Bankruptcy Court approving the DIP Loan Facility to be used in accordance with the DIP Budget, with periodic draws allowed thereafter up to the full amount of the DIP Budget, subject to, among other conditions, no Events of Default (as defined in the DIP Loan Facility).

46. Additional details and more specific terms and conditions of the proposed DIP Loan Facility can be found in the DIP Motion and the DIP Credit Agreement annexed thereto.

47. The Debtor's sale process efforts hinge on its ability to borrow under the proposed DIP Loan Facility and, to the extent collected, use cash collateral to maintain a minimum amount of operations to continue as a going concern as required by Desmarais as the stalking horse offeror for the Debtor's assets. The Debtor requires sufficient liquidity to satisfy its ongoing cash requirements, to purchase materials and other goods for its research and development, pay employees, pay rent and utilities and to fund other ordinary course day-to-day expenditures. In addition, the Debtor's suppliers, vendors and other creditors are looking to the immediate approval of the proposed borrowing and use of cash collateral for assurance that they will be paid on a continuous and timely basis during the Chapter 11 sale process. The Debtor's employees see the use of DIP financing and cash collateral as necessary to ensure timely payment of payroll and other employee-related obligations. The ongoing cooperation of suppliers, vendors and employees is critical if the Debtor is to continue to operate in an orderly and reasonable manner which seeks to preserve and enhance the value of its assets for the benefit of all parties-in-interest until it can complete its sale process.

48. If the Debtor is not able to borrow the necessary funds and use any cash collateral it may collect, there would be a precipitous termination of the Debtor's business that would destroy the going-concern value of the Debtor's assets, resulting in immediate and irreparable harm to the Debtor's estate and its creditors.

49. The proposed DIP Loan Facility, in accordance with the DIP Budget, allows the Debtor to continue operations and meet administrative expenses anticipated to be incurred during the sale process as well as propose and seek confirmation of a plan of liquidation. The proposed DIP Budget also includes the use of the minimal Cash Collateral that is anticipated to be received during the case which the Pre-Petition Secured Creditors are willing to allow the Debtor to use.

The DIP Budget presented reflects sufficient cash, upon funding of the DIP Loan Facility, which is required to meet the cash requirements of the Debtor's operations and administrative costs of its sale and liquidation process on the terms described herein. The Debtor believes that the terms of its borrowing of funds from Desmarais on a secured superpriority basis and use of Cash Collateral are reasonable and fair under the circumstances and, therefore, serve the best interests of the Debtor, its creditors and its estate.

50.     Without the DIP Loan Facility, the Debtor has no working capital to continue its operations or pay for the administrative expenses of the Chapter 11 Case, both of which are required to complete the proposed sale of its assets.

51.     Because of the Debtor's financial condition and capital structure, it has no funds available to it and is unable to obtain unsecured credit allowable under § 503(b)(1) of the Bankruptcy Code as an administrative expense. Moreover, financing on a post-petition unsecured or solely on a superpriority basis is not available to the Debtor. At this point, the Debtor does not have access to the capital markets in which to obtain further financing on reasonable terms or in sufficient amounts to take it out of the "treading water" status it has been in until a large capital raise sufficient to commence the Phase 2 trials on *BRTX-1*00 could be found.

52.     The Debtor is not a candidate for borrowing from traditional financial institutions because it lacks any appreciable revenues. For the past six months, BRT relied almost exclusively on convertible debt financing instruments (with some equity funding directly into the Company by qualified, sophisticated investors). As recently as September 2019, the Company, utilizing an investment bank, attempted a public offering that was not successful and BRT continued to suffer lack of funding. Because of the Company's depressed share price, it has become more difficult for the convertible notes to convert into equity resulting in the Company's balance sheet being

weighed down by that debt. The Company reached out to certain advisors that specialized in mitigating convertible note scenarios; those efforts did not result in any reliable, achievable or optimistic plan presented to the Company. As such, there currently appears to be no path or avenue for funding of any kind due to the depressed stock price creating an investment atmosphere unattractive to any form of funding. The Company's efforts were constant and continuous to attract financing with no recent success.

53.     The terms and conditions of the DIP Loan Facility were negotiated in good faith and at arms' length, with all parties being represented by counsel.

54.     Accordingly, BRT believes that the terms of the proposed DIP Loan Facility and use of Cash Collateral are reasonable and fair in the business judgment of the Debtor under the circumstances and, therefore, serve the best interests of the Debtor, its creditors and its estate.

55.     In the absence of an immediate ability to access the DIP Loan Facility and use of cash collateral, the Debtor's attempts to maximize its value for creditors would be immediately and irreparably jeopardized.

## Motion for Authority to Continue Existing Insurance Coverages

56.     The Debtor maintains numerous insurance policies in its ordinary course of business that provide coverage for, among other things, general liability, automobile liability, property damage, workers compensation, and directors and officers liability. Accordingly, by motion, the Debtor seeks to continue and/or renew such coverages (the "Insurance Continuation Motion"). A list of the Debtor's insurance policies is annexed to the Insurance Continuation Motion as Exhibit A (the "Insurance Policies"). The Insurance Policies are essential to preserve the value of the Debtor's business and assets, and are, in some cases, required by various laws (including the laws of the State of New York), regulations or contracts that govern the Debtor's

business.  Certain insurance policies are also required by the Guidelines established by the Office of the U.S. Trustee for chapter 11 bankruptcy cases (the "Operating Guidelines"), including the workers compensation insurance, commercial liability and directors and officers insurance.  It is critical that the Insurance Policies be maintained and renewed on an ongoing and uninterrupted basis.

57. The Debtor's policy for health care coverage for its employees costs $23,161.40 per month and the premium for March 2020 is currently due.  Workers' compensation is statutorily required and the monthly payment is $502.47.  The Debtor seeks to pay those premiums in order to ensure continued and uninterrupted coverage for its employees.  That will protect the health and well-being of its employees, including maintaining employee morale.

58. The Debtor's general commercial liability policy (the "General Liability Policy") just renewed for another year and is now currently set to expire on March 21, 2021, and its directors and officers insurance policy (the "D&O Coverage") is currently set to expire on March 21, 2020.  I am advised that both of those coverages are required to be maintained by the Debtor under the guidelines of the Office of the United States Trustee, when appropriate.  *See* Operating Guidelines Sec. 6 (requiring maintenance of appropriate insurance coverage).  The Debtor believes continuation of those coverages is appropriate in this case as they provide an important layer of protection of the value of the Debtor's assets and its estate generally.

59. For the General Liability Policy, the cost of the new policy is approximately $7,000.00 for the year.

60. Therefore, the Debtor requests that the Court authorize it to pay all prepetition premiums, fees and expenses arising under, or related to, the insurance policies.

61. Prior to the Petition Date, the Debtor requested that its insurance broker, Arthur J. Gallagher & Co. (the "Broker"), seek quotes for the renewal or extension of the Debtor's existing General Liability Policy and its D&O Coverage, including run off or tail coverage given the Debtor's plan to liquidate. The Debtor believes that there are no accrued and unpaid commissions or fees owed to the Broker as of the Petition Date.

62. With regard to the D&O Coverage, the broker advised the Debtor that it (i) discussed renewing or extending coverage with the underwriter for the current policy as well as (ii) went out into the marketplace to find other quotes. The Debtor's existing insurance carrier offered the best terms under the circumstances, which is a fully-earned premium of $400,000 for an extension of the existing policy for one year with wind down coverage and six years of tail coverage. The coverage would stay at the current existing $3,000,000. The Debtor was advised by the Broker that those terms are not outside the ordinary for companies in the Debtor's position with most of the premium being front-loaded such that a decrease in the term of the tail coverage would not result in substantial savings.

63. By going with an extension of the existing D&O Coverage policy with its existing carrier, the Debtor avoids a lengthy application and underwriting process that would otherwise be required by a new insurer. In this instance, the underwriting process has already been done. Moreover, extending the D&O Coverage is contemplated in the DIP Facility, and the DIP Budget contains the $400,000 premium as a line item.

64. The Debtor believes that D&O Coverage provides a continuing benefit to the Debtor's Estate and its creditors in the event anyone makes any claims against an officer or director of the Debtor. Although the Debtor believes that any such claims would be without merit, continuation of D&O Coverage through the wind down coverage and tail coverage insures that if

claims against those parties are brought, insurance will be in place to address those claims and available to the Debtor's Estate in the event a covered loss occurred and results in payment under that coverage.

65. The Debtor has considered the costs of the renewal of the D&O Coverage weighed against the need to continue such coverage given the Debtor's current financial and business position and has determined in its reasoned business judgment that extension of the D&O Coverage is warranted, reasonable and appropriate, and provides near and long term benefit to the Debtor, its creditors and its Estate.

### **Information Required By Local Rule 1007-4**

66. It is my understanding that Local Rule 1007-4 requires the Debtor to disclose certain information relating to its assets, liabilities and financial condition. Except for information reflected above, the Debtor continues to gather that required information. The undersigned will amend this Declaration promptly upon determination of further information required under Local Rule 1007-4.

Dated: Melville, New York
      March 20, 2020

/s/Mark Weinreb
_____
Mark Weinreb, Authorized Signatory