Richard J. McCord, Esq.
Certilman Balin Adler & Hyman, LLP
Proposed Counsel to the Debtor and
Debtor in Possession
90 Merrick Avenue, 9th Floor
East Meadow, New York 11554
Phone: 516-296-7000
Fax: 516-296-7111

Hearing Date:  T.B.D.
Time:  T.B.D.
Objection Date:  T.B.D.
Time:  T.B.D.

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
In re:

BIORESTORATIVE THERAPIES, INC.,

Debtor.
----------------------------------------------------------x

Chapter 11

Case No.: 8-20-71757-reg

**MOTION FOR ENTRY OF AN ORDER (I)
APPROVING AND AUTHORIZING BIDDING PROCEDURES
IN CONNECTION WITH THE SALE OF SUBSTANTIALLY
ALL ASSETS TO PHOENIX CELL GROUP HOLDINGS, LLC,
ITS NOMINEE OR DESIGNEE, SUBJECT TO HIGHER OR
BETTER OFFERS, (II) AUTHORIZING THE DEBTOR TO ENTER
INTO THE STALKING HORSE APA, (III) APPROVING AND AUTHORIZING
EXPENSE REIMBURSEMENT; (IV) AUTHORIZING AND APPROVING
THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS
AND UNEXPIRED LEASES, (V) APPROVING THE FORM AND
MANNER OF NOTICE THEREOF, AND (VI) GRANTING RELATED RELIEF**

BioRestorative Therapies, Inc. (the "Debtor"), the debtor and debtor in possession in the

above-captioned case, by and through its proposed counsel, Certilman Balin Adler & Hyman, LLP,

hereby files this motion (the "Motion") seeking the entry of orders by the above-captioned court

(the "Bankruptcy Court"), including: (i) an Order authorizing Debtor to enter into and perform its

obligation under an asset purchase agreement, dated March 19, 2020, as amended March 30, 2020

(the "Stalking Horse APA") providing for the sale of substantially all of the assets of the Debtor's

estate ("Estate"), including the assumption and assignment of certain of the Debtor's executory

1

contracts and its unexpired lease of non-residential real property, to Phoenix Cell Group Holdings, LLC or its nominee or designee ("Phoenix,"), free and clear of all liens, claims, interests and encumbrances (collectively, the "Liens"), subject to higher or better offers and approval of the Bankruptcy Court; and (ii) an Order (the "Bid Procedures Order") approving certain bidding and notice procedures relating to the Sale, including, but not limited to granting expense reimbursement to Phoenix in the event it is not the successful purchaser of the Sale Assets (the "Bid Procedures"), and (2) scheduling a hearing (the "Sale Hearing") to approve the entry of an order designating the highest and best offer for the Sale Assets and authorizing and approving the Sale to the highest and best offeror (the "Sale Order"); and (ii), following the Sale Hearing, entry of the Sale Order; and (iii) granting related relief.  In support of this Motion, the Debtor respectfully states as follows:

## I.
## PRELIMINARY STATEMENT

1.      The Debtor's current financial state is that it has no money available to fund ongoing operations and is without third party funding sources on the horizon except certain debtor in possession funding discussed below.  Prior to the Petition Date (defined below), the Debtor received an offer from Phoenix, whose sole member is John M. Desmarais ("Desmarais"), one of the Debtor's former directors and who is currently the sole secured creditor and a substantial shareholder of the Debtor, for the Debtor to sell all or substantially all of the Debtor's assets, including, but not limited to, its owned intellectual properties and licenses of other intellectual properties (collectively, the "Sale Assets") through an orderly, competitive bid and sale process (the "Sale") to Phoenix, subject to higher or better offers and Bankruptcy Court approval.

2.      That offer was thereafter negotiated by the Debtor and Phoenix and culminated in the execution of the Stalking Horse APA, which provides for the purchase by Phoenix of the Sale

Assets, subject to the approval of this Bankruptcy Court and higher or better offers. A copy of the Stalking Horse APA is annexed hereto as **Exhibit "A"**. The Stalking Horse APA contemplates the Sale of the Sale Assets in Debtor's Chapter 11 bankruptcy case under § 363(b) and (f) of the Bankruptcy Code.

3.      To facilitate the Debtor's ongoing operations until the consummation of the Sale, Phoenix also agreed to provide debtor in possession financing sufficient to maintain operations of the Debtor, pay for the operating and administrative costs of the case according to an agreed upon budget (the "DIP Budget"), and implement the Sale process, all pursuant to the terms of that certain DIP Loan and Security Agreement, dated March 19, 2020, as amended and restated on March 30, 2020 (the "DIP Facility"), between Phoenix and the Debtor, conditioned upon entry of the Bidding Procedures Order, absent which Phoenix will not enter into the DIP Facility or make any post-petition loans to Debtor. By motion filed on March 23, 2020, the Debtor seeks interim and final Bankruptcy Court approval of the DIP Facility (the "DIP Motion").

4.      Accordingly, after considering available options within the context of the current status of the Debtor's operations and inability to secure sufficient funding, the Debtor determined in its business judgment to accept Phoenix' offers to purchase the Sale Assets under the Stalking Horse APA, subject to this Bankruptcy Court's approval and higher or better offers, and to fund the Sale process under 11 U.S.C. § 363(b) and (f) with the DIP Facility, subject to entry of both an order of the Court approving the DIP Facility on an interim basis (the "Interim Dip Order") and the Bid Procedures Order.

5.      On March 26, 2020, the Bankruptcy Court held an emergency hearing on, among other motions, the IP Motion, during which the Bankruptcy Court indicated that final approval of the Sale would be more appropriate through a plan process that could run concurrently with the

Sale process.  The Debtor submits that a liquidation of its assets appears to be the only path forward, and the only path for which financing has been obtained.  Accordingly, the Debtor respectfully submits that regardless of whether a plan of liquidation is confirmed, the assets will end up being liquidated one way or another.  The process and timeline provided for herein is substantially similar to the process and timeline approved in by the Bankruptcy Court in other cases.  Moreover, the Debtor is concerned that it is too early in the case to get a sense of whether it would be able to find, at a minimum, an impaired consenting class in order to confirm a plan. The Debtor intends to file a proposed plan and disclosure statement by Monday, April 6, 2020 that will propose the mechanism for disbursing any and all proceeds from the Sale, establishing any trusts necessary to address any claims the Debtor may hold against anyone, and seek customary exculpation, injunction and release provisions.  The Debtor further intends to seek authority to proceed on the plan path along the same timeline proposed herein so that plan confirmation and sale approval are heard on the same day.

6.      By this Motion, the Debtor seeks the Court's (i) approval of the Bid Procedures incident to the Sale, including the approval of the Stalking Horse APA and authorizing Debtor to execute and perform all pre-Closing obligations under the Stalking Horse APA as the stalking horse bidder for the Sale Assets; (ii) upon the Sale Hearing, designation of the highest or best offer for the Sale Assets and approval of the Sale of the Sale Assets to the successful bidder for the Assets at the conclusion of the sale process; and (iii) granting of such other and further relief as is just and proper.

7.      Because of the Debtor's current financial state and the amount of money Phoenix is willing to lend under the DIP Facility in accordance with the DIP Budget, conditioned upon approval of the Stalking Horse APA and the Bid Procedures, including the Bid Protections (defined

below) the Debtor seeks to consummate the Sale of the Sale Assets within the thirteen (13) weeks provided for in the DIP Budget.  In order to do so, the Debtor seeks emergency entry of the Bid Procedures Order so that the marketing of the Sale Assets and the timeline for a sale process can be established and started forthwith.

8.      As provided for in the Stalking Horse APA, the Sale Assets include, but are not limited to:  (i) the Disc IP License; (ii) other intellectual properties owned by the Debtor, including patents, patent applications and trademarks; (iii) laboratory equipment; (iv) accounts receivable that may accrue during the Debtor's case (to the extent not accounted for in the DIP Budget), (v) office equipment and furniture; (vi) populations of human cell lines; and (vii) research agreements with two universities.

## II.
## JURISDICTION

9.      This Bankruptcy Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and venue is proper under 28 U.S.C. §§ 1408 and 1409.

10.      The legal predicates for the relief requested in this Motion are §§ 105(a), 363, 365, 503(b), 507(a), 541, and 1106 of chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), and Rules 2002, 6004, 6006, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 2002-1, 6004-1 and 9006-1 of the Local Bankruptcy Rules for the Eastern District of New York (the "Local Rules") and the Sale Guidelines adopted as Administrative Order No. 557 of the United States Bankruptcy Court for the Eastern District of New York.

## III.
## BACKGROUND

### A. The Debtor's Business and Assets and Significant Obligations.

11.     The Debtor develops therapeutic products and medical therapies using cell and tissue protocols, primarily involving adult stem cells. It is currently pursuing its *Disc/Spine Program* with an initial investigational therapeutic product called *BRTX-100*. In February 2017, the Debtor received authorization from the Federal Drug Administration to commence a Phase 2 clinical trial investigating the use of *BRTX-100*, the Debtor's lead cell therapy candidate, in the treatment of chronic lower back pain arising from degenerative disc disease. Prior to the bankruptcy filing, the Debtor intended to commence such clinical trial for *BRTX-100* upon the receipt of necessary funding of between $10 million and $12 million. The Debtor has not been able to raise those funds and does not anticipate raising them at this point. *See* Weinreb Dec. ¶ 5.

12.     In developing *BRTX-100*, BRT obtained a license to use patent-pending technology for investigational adult stem cell treatment of disc and spine conditions, including protruding and bulging lumbar discs (the "Disc IP License"). The technology is an advanced stem cell injection procedure that may offer relief from lower back pain, buttock and leg pain, and numbness and tingling in the leg and foot. Moreover, that license also includes a patented investigational curved needle device that is a needle system designed to deliver cells and/or other therapeutic products or materials to the spine and discs. Also as part of that license, the Debtor sublicenses a part of the licensed intellectual property back to the licensor which results in yearly revenues. The revenue generated from that sublicense in 2019 totaled $130,000. All other monies necessary for the operations of the Debtor have come through debt and/or equity financings throughout the years. *Id.* at ¶ 6.

13.     The Debtor is also developing its ThermoStem™ Program. This pre-clinical program involves the use of brown adipose (fat) in connection with the cell-based treatment of type 2 diabetes and obesity as well as hypertension, other metabolic disorders and cardiac deficiencies. Patents related to the *ThermoStem Program* were issued, or are scheduled to be issued, to the Debtor by (i) the United States in September 2015, January 2019 and March 2020; (ii) Australia in April 2017 and October 2019; (iii) Japan in December 2017; and (iv) Israel in August 2019. Additionally, a patent from the European Union will issue in the near future.

14.     The Debtor's offices and laboratory are located at 40 Marcus Drive, Suite One, Melville, New York (the "Premises"), which it leases under a non-residential lease of real property (the "Lease"). The Lease is currently in arrears four months, which amount would need to be cured in order for that lease to be assumed and assigned. The Premises holds the Debtor's various sophisticated lab equipment and office furniture, fixtures and equipment, as well as stem cell lines.

**Security Interests in Assets**

      a.   Pre-Petition Secured Loan Agreements

15.     The Debtor's pre-petition secured borrowings for loans, advances and other financial accommodations are comprised of the following promissory notes and security agreement.

- That certain Promissory Note in the principal sum of $500,000.00 dated June 30, 2016 (as amended on July 5, 2017, as further amended on November 17, 2018, as further amended on November 20, 2018, and as further amended on December 17, 2019, the "Tuxis Note"), issued by the Debtor to Tuxis;

- That certain Promissory Note in the principal sum of $175,000.00, dated July 13, 2017 (as amended on November 17, 2018, as further amended on November 20, 2018, and as further amended on December 17, 2019 (the "Desmarais Note," and collectively with the Tuxis Note, the "2016/2017 Notes")), issued by Debtor to Desmarais; and

- That certain Security Loan Agreement dated July 13, 2017 and recorded with the Delaware Department of State and with the United States Patent and Trademark Office, securing the 2016/2017 Notes.

16.    In order for the Debtor to continue to operate until it could file for bankruptcy protection and begin its § 363 sale process, between February 20, 2020 and February 26, 2020, it borrowed an additional $353,761.99 from Desmarais under the following promissory notes and security agreement.

- That certain Promissory Note in the principal sum of $320,200.49, dated February 20, 2020, issued by Borrower to Lender (the "First February Bridge Note");

- That certain Promissory Note in the principal sum of $33,561.50, dated February 26, 2020 (the "Second February Bridge Note", and, together with the Tuxis Note, the Desmarais Note, and the First February Bridge Note, the "February Bridge Notes"); and

- That certain Security Loan Agreement dated February 20, 2020 (as amended February 26, 2020) and recorded with the Delaware Department of State, and with the United States Patent and Trademark Office, securing the February Bridge Notes.

b.  Pre-Petition Loan Obligations

17.    As of the Petition Date, the Debtor was indebted to the Pre-Petition Secured Creditors on the 2016/2017 Notes in an aggregate outstanding amount of not less than $999,027.40 and on the February Bridge Notes in an aggregate outstanding amount of not less than $356,836.03, including interest accrued as of that date, plus interest subsequently accruing thereon, plus all costs, fees, expenses (including attorneys' fees and legal expenses) and other charges accrued, accruing or chargeable with respect thereto.

18.    On March 26, 2020, Auctus Funding LLC, the Debtor's largest unsecured creditor, filed an objection to, among other things, the DIP Motion, raising an issue whether the pre-petition security interest securing the 2016/2017 Notes was properly and timely perfected pre-petition. *See*

ECF Doc. No. 25.  While not conceding that such amounts owed under the 2016/2017 Notes are not secured, Phoenix has, among other things, revised the Purchase Price (defined below) under the Stalking Horse APA to limit its Credit Bid (defined below) to the amount accrued and owing under the February Bridge Notes and the amounts advanced under the DIP Facility.

### C. **Bankruptcy Case and Efforts to Sell**

19.     On March 20, 2020 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, thereby initiating the above-captioned bankruptcy case in the Bankruptcy Court and creating its bankruptcy Estate.

20.     The Debtor remains in possession of its property and management of its affairs pursuant to Bankruptcy Code §§1107(a) and 1108.  No trustee, statutory committee or examiner has been appointed in this case.

21.     During the past year, the Debtor directly and through retained professionals reached out to numerous persons and entities, including individuals, medical device companies, healthcare funds, cell therapy companies, and pharmaceutical companies, in an attempt to summon interest by these entities to make a financial commitment to the Debtor's programs through primarily licensing or purchasing structures. The discussions targeted a plethora of industries and the full range of company sizes and value.  There was no interest in acquiring outright any of the Debtor's programs or technology, or the Company itself.  In addition, the Debtor was advised that any potential interest in the technology would only occur after a successful clinical trial of *BTRX-100* (which the Debtor has yet to start and is unable to commence due to a lack of funding).  After contacting over 70 parties involved in degenerative disc disease, back pain, devices to treat the spine and general regenerative medicine, no parties expressed adequate interest to offer any indication to partner, acquire or license the Debtor's programs.  Regardless, the Debtor intends to

reach out to parties it has previously approached or responded to as part of its renewed marketing efforts.

### D. **The Stalking Horse APA**

22.     Prior to the Petition Date, the Debtor entered into an asset purchase agreement with Phoenix, subsequently amended post-petition, *i.e,*, the Stalking Horse APA, as the stalking horse bidder, under which the Debtor will sell the Sale Assets to Phoenix, subject to Court approval and higher and better offers.  The salient terms of the Stalking Horse APA are as follows:

> (a)     Purchase Price.  The purchase price for the Sale Assets consists of (i) (A) $500,000 in cash plus (B) an additional amount in cash equal to the maximum amount to be lent under the DIP Facility minus the amount actually loaned under the DIP facility as of the date of the Auction for the Sale for the Sale Assets under the Bidding Procedures Order (the "Auction"); (ii) a credit bid by Phoenix of the aggregate, outstanding indebtedness under the DIP Facility, as of the Auction date, plus the outstanding balance of the Bridge Loans due to Desmarais, as of the Auction date; (iii) a reimbursement of Phoenix's out-of-pocket costs, expenses and fees, including legal, accounting, and other third party advisory or service costs, expenses and fees incurred by Phoenix and its affiliates in connection with the negotiation of the APA, the DIP Facility and the consummation of the Sale, up to and not exceeding $250,000 and as further described in the APA (the "Expense Reimbursement"); and (iv) all cash amounts that will be required to be paid upon the consummation of the Sale to cure any monetary defaults in executory contracts and the Lease acquired pursuant to the APA under 11 U.S.C. § 365 ((i)-(iv), collectively, the "Purchase Price");

> (b)     Phoenix's Conditions to Closing.  Phoenix's obligation to close the Sale under the Stalking Horse APA (the "Closing") is subject to certain conditions, including, among other things:  (i) the accuracy of the Debtor's representations and warranties, (ii) the Debtor's compliance in all material respects with all covenants, agreements, obligations and other conditions required to have been satisfied prior to the Closing, (iii) the delivery of all documents, certificates and other items required to be delivered by the Debtor prior to the Closing, (iv) a sale order in form and substance satisfactory to Phoenix shall have been entered and confirmed by this Bankruptcy Court, (v) the entry by Francisco Silva into a written employment agreement in form and substance satisfactory to Phoenix[1],

---

[1] R&G/PM Note to Draft:  Ropes and CB to discuss F. Silva's employment agreement with John D.

and (vi) the obtainment of all Consents (as defined in the Stalking Horse APA) as may be required;

(c)    Debtor's Conditions to Closing.    The Debtor's obligation to consummate the Sale under the Stalking Horse APA includes the following conditions:  (i) the accuracy of Phoenix's representations and warranties, (ii) the compliance by Phoenix in all material respects with all covenants required to have been satisfied prior to the Closing, (iii) the delivery of all documents, certificates and other items required to be delivered by Phoenix prior to the Closing, and (iv) a sale order in form and substance satisfactory to Phoenix shall have been entered and confirmed by this Bankruptcy Court; and

(d)    Termination of the Stalking Horse APA.  The Stalking Horse APA may be terminated upon, but not limited to, the occurrence of the following events: (i)  by Phoenix, if the Bid Procedures Order has not been entered by this Bankruptcy Court on or prior to 14 days following the Petition Date, *i.e.*, on or before April 3, 2020, (ii) by Phoenix, if the Sale Order (as defined in the Stalking Horse APA) has not been entered by this Bankruptcy Court on or prior to 44 days following the date of this Motion, (iii) by Phoenix, if the Bid Procedures Order or the Sale Order (each as defined in the Stalking Horse APA) is modified in any respect without the consent of Phoenix, (iv) by either Phoenix or the Debtor (provided Debtor has materially complied with Section 8 of the Stalking Horse APA) if Debtor enters into an Alternative Transaction (as defined therein), this Bankruptcy Court approves an Alternative Transaction or if Phoenix is not the Successful Bidder or the Back-Up Bidder (each as defined below), and (v) by Phoenix if this Bankruptcy Court either (A) enters an order, pursuant to 11 U.S.C. § 362, lifting or modifying the automatic stay in respect of the Sale Assets or (B) if the case is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers is appointed.

23.    Parties are encouraged to review the Stalking Horse APA for the full terms and conditions of same.

24.    Absent the Sale of the Sale Assets, it is unlikely that the Debtor would be able to prevent its secured creditors from foreclosing on the Debtor's assets and thereby eliminating any ability to provide any material amount of money to its unsecured creditors.  The Debtor believes no further purpose can be served in maintaining the Debtor's operations for a prolonged period beyond the Sale process without additional funding and incurring the extra cost and expense of

seeking to reorganize the Debtor's business due to its stage in business development, which relies on debt and/or equity investments to fund operations.  The Debtor strongly believes that the Sale Assets must be sold as quickly as possible in order to preserve the value of those Assets for the benefit of the Debtor, its creditors and its Estate.

### E.  **Bid Protections**

25.    The Stalking Horse APA contemplates the payment of certain protections in the event of Court approval of a Sale to a party or parties other than Phoenix.  Specifically, pursuant to the Stalking Horse APA, Phoenix is entitled to be paid the Expense Reimbursement in the event that Phoenix is not the Successful Purchaser.  The Debtor requests the Court grant the proposed Expense Reimbursement administrative expense priority pursuant to 11 U.S.C. §§ 503(b) and 507(b)  and direct that the Expense Reimbursement be paid at the Closing of the Sale.  The proposed Expense Reimbursement is an essential element of the Stalking Horse APA and Phoenix will not enter into the Stalking Horse APA unless that term is included in the agreement approved by the Court.  The Debtor believes that the efforts of Phoenix have increased the chances that the Debtor will receive the highest or otherwise best offer for the Sale Assets by establishing a minimum bid for other bidders and by subjecting the Sale Assets to an open auction on notice to all creditors of the Debtor, which persons are best positioned to understand and be interested in bidding on the Sale Assets, and which will serve as a catalyst for other potential or actual bidders.  Thus, the inclusion of the Expense Reimbursement in the Stalking Horse APA benefits the Debtor, the Estate, its creditors and all other parties in interest.  Moreover, the Debtor seeks, and has agreed to in the Stalking Horse APA, to have cash bidding increments of $50,000.00 (collectively with the Expense Reimbursement, the "Bid Protections").

26.     The Debtor submits that (a) approval of the Expense Reimbursement is an integral part of the Stalking Horse APA, (b) in the absence of the Debtor's obligation to pay the Expense Reimbursement, Phoenix will not enter into the Stalking Horse APA, (c) the Stalking Horse APA is necessary for the preservation of the Debtor's Estate and is beneficial to the Debtor, the Estate, creditors and other parties in interest which will provide no less than $500,000.00 for the Debtor's unsecured creditors, and (d) the Expense Reimbursement is reasonable in relation to Phoenix's efforts and the amount of consideration contemplated by the Stalking Horse APA.

27.     Accordingly, the Debtor requests that the Court approve the Bid Protections, including authorization of the payment of Expense Reimbursement pursuant to the terms and conditions of the Stalking Horse APA in the event that Phoenix is not the Successful Bidder.

## IV.
## SUMMARY OF BID PROCEDURES

28.     In order to ensure that the maximum potential value of the Sale Assets is obtained, Debtor has entered into the Stalking Horse APA that designates Phoenix as a stalking horse bidder, subject to higher and better offers.  As further described below, in recognition of Phoenix's efforts in participating in the Auction as a stalking horse bidder, the Stalking Horse APA provides that Phoenix be entitled to receive the Expense Reimbursement in the event, and only in the event, that another party is selected as the Successful Bidder.

29.     Accordingly, the Debtor seeks to engage in the Auction process to solicit additional offers for the Sale Assets to obtain the maximum consideration in respect of the Sale thereof, subject to the Bid Procedures (attached as Exhibit A to the Bidding Procedures Order) as described, in relevant part, as follows:

(a)     Pre-Auction Bidding; Deadlines. Potential Bidders shall be required to complete and execute a confidentiality agreement acceptable to the Debtor and its advisors (which

shall include protection for any trade secrets to the extent needed) which includes terms and provisions at least as restrictive as those set forth in the Stalking Horse APA, assignable to any successful purchaser or purchasers, and shall return that executed confidentiality agreement to the Debtor (each, a "Potential Bidder"). The Debtor shall send to each Potential Bidder a copy of the Stalking Horse APA. The Debtor will provide reasonable access to the Debtor's books, records, facilities (subject to applicable laws or other government restrictions in effect at the time) and executives to the Potential Bidders for the purpose of conducting due diligence. In order to become a "Qualified Bidder" under the Bidding Procedures, the Debtor proposes that a Potential Bidder shall provide to the Debtor, through Certilman Balin Adler & Hyman, LLP, counsel to the Debtor, so as to be actually received by 5:00 p.m. on May 11, 2020 (the "Bidding Deadline"), via e-mail or facsimile transmission, and, where possible, hard copy, a bid (a "Bid") that meets the requirements below.

   (b)  Qualified Bidder Requirements.  To be a "Qualified Bid", the Bid shall be in writing, be received by the Debtor by the Bidding Deadline and must:

    i. Provide for an offer to purchase for cash and acquire of all Debtor's Sale Assets, including a binding and enforceable signed writing that such Potential Bidder's offer is irrevocable unless and until the Debtor accepts a higher or otherwise superior Bid;

    ii. (A) exceed the Purchase Price in the APA by an aggregate amount of cash (the "Overbid Amount Requirement") equal to (x) at least $50,000, *plus* (y) the Expense Reimbursement; (B) not be conditioned on the outcome of such bidder's due diligence (and shall contain an express representation that such Potential Bidder has had full opportunity to conduct satisfactory due diligence), (C) not be conditioned on such bidder's ability to obtain financing and (D) include a commitment to close the transactions within the timeframe contemplated by the Stalking Horse APA and these Bid Procedures;

iii. provide as good as or better terms as contained in the Stalking Horse APA, with any proposed changes to be provided via a redlined agreement or similar comparison marked against the Stalking Horse APA;

iv. include sufficient evidence to Debtor of its financial ability to consummate a closing of the transactions contemplated hereby and such other information as the Debtor may reasonably request; and

v. fully discloses (a) the identity of each entity that will be purchasing all or some of the Sale Assets, including any equity holders in the case of a Potential Bidder which is an entity formed specially for the purposes of effecting the Sale, or otherwise participating in the transaction in connection with such bid (including the complete terms of any such participation, including any arrangements, agreements or understandings concerning a collaborative or joint bid or any other combination concerning the proposed bid), (b) any connections, relationships (business or otherwise), whether or not known, or other agreements or understandings with the Debtor or its affiliates or any other known Potential Bidders, and (c) a detailed description of any anticipated regulatory or governmental approvals necessary to consummate the Bid.

(c) <u>Deposit</u>. To be a Qualified Bid, each submitted Bid must be accompanied by a good faith deposit in an amount equal to the Security Deposit in the Stalking Horse APA ($300,000.00) by wire transfer to an account designated by the Debtor;

(d) <u>Bid Protections</u>. As more fully described above, in recognition of Phoenix's efforts as the stalking horse bidder under the APA, Phoenix will be entitled to the Expense Reimbursement if another Qualified Bidder is selected as the Successful Bidder.

(e) <u>No Contingencies or Due Diligence</u>. All Qualified Bids must not contain any conditions or contingencies, which have not yet been satisfied, including financing, due diligence or corporate approvals.

(f) <u>Minimum Bid</u>. Each Qualified Bid shall contain a purchase price for the Assets which exceeds the Overbid Amount Requirement.

(g) <u>Assumption and Assignment of Contracts</u>.  If closing such Bid is conditioned on the assumption and assignment of any executory contracts or unexpired leases, the Bid must also include sufficient information to permit the Court, the Debtor, and the applicable lessor and/or contracting counter-parties to determine such bidder's ability, as proposed assignee, to comply with § 365 of the Bankruptcy Code (to the extent applicable), including providing adequate assurance of such assignee's ability to perform in the future (the "<u>Adequate Assurance Package</u>").  Potential Bidders must also provide the Adequate Assurance Package directly to any party to such contracts or lease so that it is actually received by such party on or before the Bid Deadline, and the provision of such Adequate Assurance Package as required shall be a condition for such Bid to constitute a Qualified Bid under the Bid Procedures.

(h) <u>Sale if No Qualified Bidders</u>. If the Debtor does not receive any Qualified Bids with respect to the Sale Assets other than from Phoenix as set forth in the APA, the Debtor shall not hold an Auction and Phoenix shall be deemed the Successful Bidder upon the Bid Deadline with respect to the Sale Assets.

(i) <u>Back-Up Bidder</u>. To constitute a Qualified Bidder, each bid must also provide that (I) if the Qualified Bidder's Bid does not result in the Bid being the highest or best bid and the Qualified Bidder is not the Successful Bidder at the conclusion of the Auction, but which Bid is the next highest or best Bid, as determined by the Debtor in its sole discretion, such Qualified Bidder shall be deemed to be the "<u>Back-Up Bidder</u>" and (II) if the Qualified Bidder is deemed the Back-Up Bidder and the Debtor fails to consummate a closing with the Successful Bidder, the Debtor shall give the Back-Up Bidder ten (10) Business Days' written notice in order to

allow the Back-Up Bidder, now the Successful Bidder for all closing requirements, to consummate a closing of the sale of the Sale Assets.

(j) <u>Stalking Horse Qualified Bidder; Credit Bid</u>. As a result of the Stalking Horse APA, Phoenix shall be and is deemed to be a Qualified Bidder and shall and will be told if any other bids are received no later than one business day after the Qualified Bid Deadline and shall provide a copy of such Qualified Bid, including the terms thereof, to Phoenix (with the identity of the bidder or bidders redacted). Phoenix shall be entitled, for purposes of satisfying the requirements for a Qualified Bid above and for purposes of subsequent or continued bids pursuant to Auction, to credit bid, as part of its Qualified Bid or any subsequent Bid, in its sole and absolute discretion, any portion and up to the entire amount of the indebtedness owed to Phoenix by the Debtor pursuant to the: (i) DIP Facility, as of the Auction Date plus (ii) any portion and up to the entire amount of the indebtedness owed to Desmarais by the Debtor pursuant to the Bridge Loans, to the fullest extent permitted under and consistent with 11 U.S.C. § 363(k), in conjunction with the Sale of the Sale Assets pursuant to the Stalking Horse APA (the "<u>Credit Bid</u>").

(k)     <u>Auction</u>.

i. Following the Bid Deadline, Debtor shall thereafter qualify Potential Bidders as Qualified Bidders as and when Bids are received for continuing with the sales process, and promptly notify such persons selected as Qualified Bidders and that they will be permitted to participate in the bidding process.

ii. All Bids shall be kept confidential with access restricted to the Debtor, and its respective professionals, and any Committee, and its

respective professionals.  Bids may, however, be revealed to any other party at the option of the Debtor, including, but not limited to, Phoenix after the Bid Deadline has passed (with the identity of the bidder redacted).  The Debtor may request additional information from a Potential Bidder in order to evaluate the bidder's ability to consummate the proposed transaction and to fulfill its obligations in connection therewith (including adequate assurances of performance in respect of the Sale and any contracts to be assumed), and such bidder shall be obligated to provide such information as a precondition to participating further in the Auction.

iii. Nothing shall prevent the Debtor and its professionals, in consultation with the Committee and its professionals, if any, from negotiating with Potential Bidders, prior to being selected as a Qualified Bidder, or thereafter, on the terms and conditions of their Bid.

iv. <u>Auction Date</u>.  If more than one Bid is received from one or more Potential Bidders, and those bidders have been deemed Qualified Bidders, in accordance with the requirements in the Bid Procedures, the Debtor proposes that the Auction will be conducted at the offices of Certilman Balin Adler & Hyman, LLP, 90 Merrick Avenue, 9th Floor, East Meadow, New York 11554, or at another location as may be timely disclosed by the Debtor to Qualified Bidders (including by telephone or e-mail), on May 13, 2020, at 10:00 a.m. (the "<u>Auction Date</u>"). All Qualified bidders shall appear in person (and if by telephone, shall participate in such telephone

call) at the Auction, or through a duly authorized representative with sufficient authority to bind such bidder to an agreement.

v.  If any Bids other than the Stalking Horse Offer of Phoenix, satisfying all Auction requirements are received, each party submitting such a Bid and Phoenix shall have the right to continue to improve its bid at the Auction.  Any subsequent Bids shall be in increases to the Overbid Amount Requirement in minimum monetary increments of $50,000.

vi.  <u>Selection of Winning Bid</u>.  At the conclusion of the Auction, and subject to Court approval following the Auction, the Debtor will select from the Bids which is the highest or best bid (the "<u>Winning Bid</u>") for the Sale Assets and which is the second highest or best bid (the "Back-Up Bid"), provided, however, that the Debtor shall have the right to reject any and all Bids at its discretion in the exercise of its business judgment. Specifically, the Debtor may, among other things, reject any bid, other than that of Phoenix as set forth in the Stalking Horse APA, if in the Debtor's reasonable judgment no such other Bid is for a fair and adequate price.  In selecting the Winning Bid and the Back-Up bid, the Debtor will value several factors in its business judgment, including (a) the risks and timing associated with consummating any such Bid, (b) any proposed additional terms or conditions above and beyond such as are set forth in the Stalking Horse APA, (c) any offer to purchase less than all of the Sale Assets, and (d) any other factors deemed relevant by the Debtor.

19

vii.        Immediately prior to the adjournment of the Auction, the person that made the Winning Bid (the "Successful Bidder") and the person that made the Back-Up Bid shall complete and sign all agreements, contracts, instruments, or other documents evidencing and containing the terms and conditions upon which such Winning Bid and the Back-Up Bid was made.

(l)        Notice of Winning Bid; Back-Up Bid; Sale Process Supplement.  Not less than one business day prior to the Sale Hearing Date (as defined below), the Debtor shall file with the Court a sale process supplement (the "Supplement") which shall identify, among other things, (a) the Successful Bidder and the Back-Up Bidder; (b) the consideration to be paid for the Sale Assets; (c) the material terms upon which such purchase is based; (d) any executory contracts and unexpired leases to be assumed and assigned to the purchaser in connection with the sale of the Sale Assets; and (e) the treatment of any Liens attached to the Sale Assets to be sold as Permitted Encumbrances (as defined in the Stalking Horse APA).  The Supplement will further contain (i) a proposed order or orders approving the sale of the Sale Assets as outlined in the Supplement and (ii) copies of the respective asset purchase agreement entered into by the Debtor and Successful Bidder and the Back-Up Bidder.

(m)        The Supplement will be served via one or more of the following methods, hand delivery, overnight mail, e-mail (directly or through the Court's ECF noticing system) and/or facsimile upon (i) the Office of the United States Trustee; (ii) counsel to any Committee, if any; (iii) counsel to Phoenix; (iv) counsel to the Successful Bidder; (vi) counsel to the Back-Up Bidder; (vii) all parties to executory contracts and unexpired leases that will or may be assumed and assigned or rejected and (viii) to any person who submits a written request including either an e-

mail address or facsimile number so that such request actually is received by the Debtor's undersigned counsel by 5:00 p.m., May 14, 2020, and (unless otherwise requested) by first class, United States Mail, postage prepaid upon (x) all taxing authorities whose rights may be affected by the sale of the Sale Assets and the SEC, (y) all parties that have requested notice under Bankruptcy Rule 2002, and (z) the Debtor's twenty largest creditors. Any other party in interest that wishes to receive a copy of the Supplement shall make such request in writing to Certilman Balin Adler & Hyman, LLP, 90 Merrick Avenue, 9th Floor, East Meadow, New York 11554, Attn: Robert D. Nosek, Esq., Telephone: 516.296.7000, Facsimile: 516.296.7111.

(n)    <u>Court Approval; Closing</u>.    An evidentiary hearing on all the remaining relief requested in the Sale Motion and to confirm the results of the Auction (the "<u>Sale Hearing</u>") is proposed to held before the Honorable Robert E. Grossman, United States Bankruptcy Court Judge, at the United States Bankruptcy Court for the Eastern District of New York, Long Island Federal Courthouse, 290 Federal Plaza, Courtroom 860, Central Islip, New York 11722, on May 18, 2020, at 1:30 p.m.[2] or as such time thereafter as counsel may be heard (the "<u>Sale Hearing Date</u>"). The sale of the Assets will be subject to the entry of an order of the Court approving the sale.

(o)    The closing of the Sale shall occur no later than the tenth day after the Sale Order shall have become a Final Order, except that if such order otherwise provides for an earlier date in accordance with Bankruptcy Rules 6004(g) and 6006(d), then the closing shall occur no later than the tenth day after the entry of the Sale Order (the "<u>Closing Date</u>").    The Debtor has requested such an order authorizing an earlier Closing Date.    In the event the Closing Date falls

---

[2] According to the Court's self-calendaring hearing page on its website (www.nyeb.uscourts.gov), the Court currently has May 18, 2020 as an open and available hearing date, which in all cases remains subject to the Court's approval and availability.

on a Saturday, Sunday or legal Holiday (as defined in Bankruptcy Rule of Federal Procedure 9006(a)), the Closing shall occur on the next immediately following business day.

(q)    If the Successful Bidder fails to consummate the purchase of the Sale Assets, and such failure to consummate the purchase is the result of a breach by the Successful Bidder, that bidder's Security Deposit shall be forfeited to the Debtor and the Debtor specifically reserves the right to seek all available damages from the defaulting party.

(p)    Security Deposits of Qualified Bidders that not selected as either the Successful Bidder or the Back-Up Bidder shall be returned to such Qualified Bidders within three (3) business days after the conclusion of the Auction.  The return of the Security Deposit of the Successful Bidder shall be governed by the terms of that party's Bankruptcy Court-approved asset purchase agreement.  If a Back-Up Bidder has been selected and the sale of the Assets to the Successful Bidder has been closed, the Security Deposit of the Back-Up Bidder shall be returned within three (3) business days of the Closing.

## V.
## Assumption and Assignment Procedures

30.    The Debtor is party to certain executory contracts and an unexpired lease of non-residential real property for its Premises.  The Stalking Horse APA contemplates Phoenix including, at its discretion, some or all of those executory contracts as well as the Lease as part of the Sale Assets.  Other Potential Bidders may also desire to obtain such executory contracts and/or the Lease (collectively, the "Contracts") as part of their bid.  Thus, in order to facilitate the sale of the Sale Assets, the Debtor also seeks authority potentially to assume and assign each of the executory contracts and the Lease as part of the Sale, subject to Phoenix or a Successful Bidder including such executory contract(s) and/or the Lease as part of their Bid.  Thus, the Debtor is seeking authority to establish a process (the "Assignment Procedures") to determine the amount

of any cure obligations, if any, necessary to be satisfied in accordance with Bankruptcy Code section 365 for all of the executory contracts and/or the Lease to be assumed, and establish objection procedures for the Non-Debtor Counterparties. The cure amount (each, a "<u>Cure Cost</u>"), if any, that the Debtor believe is required to be paid to the applicable counterparty (each, a "<u>Non-Debtor Counterparty</u>," and collectively, the "<u>Non-Debtor Counterparties</u>") to each of the Contracts under section 365(b)(1)(A) and (B) of the Bankruptcy Code will be provided by a notice served on each of the Non-Debtor Counterparties which notice shall also contain the Assignment Procedures. The Debtor proposes to serve a notice of the Assignment Procedures and Cure Amount (the "<u>Cure Notice</u>") on each of the Non-Debtor Counterparties within ten (10) days after entry of the Bid Procedures Order.

31.     The proposed Assignment Procedures provide as follows:

(a)     If a Non-Debtor Counterparty objects to (i) the Cure Cost for its Contract, and/or (ii) to the proposed assumption, assignment and/or transfer of such Contract (including the transfer of any related rights or benefits thereunder), other than objections that relate specifically to the identity and adequate assurance of a Successful Bidder other than the Stalking Horse, and/or (iii) to the proposed identity or adequate assurance of the Stalking Horse, if any, then such Non-Debtor Counterparty must file with the Bankruptcy Court and serve on the Notice Parties (as defined below) a written objection (a "Cure Cost/Assignment Objection"). Any Cure Cost/Assignment Objection shall: (i) be in writing; (ii) state with specificity the nature of such objection, including the amount of Cure Costs in dispute; and (iii) be filed with the Bankruptcy Court, 290 Federal Plaza, Central Islip, New York 11722, together with proof of service, on or before 5:00 p.m. (ET) on May 8, 2020 (the "Cure Cost/Assignment Objection Deadline") and properly served on the Notice Parties so as to be received no later than The Cure-Cost/Assignment Objection Deadline. The "Notice Parties" are as follows: (a) proposed counsel to the Debtor, Certilman Balin Adler & Hyman, LLP, 90 Merrick Avenue, 9th Floor, East Meadow, New York 11554 (Attn: Richard J. McCord and Robert D. Nosek); (b) counsel to the official committee of unsecured creditors, if one is appointed; (c) the Office of the United States Trustee for the Eastern District of New York, Long Island Federal Plaza Courthouse, 560 Federal Plaza, Central Islip, New York 11722 (Attn: Stan Yang); (d) counsel to Phoenix, Pryor & Mandelup, LLP, 675 Old Country Rd., Westbury, NY

11590; Attn: Scott Mandelup; Neil Ackerman, and Ropes & Gray LLP, 1211 Avenue of the Americas, New York, New York 10036, Attn: Jonathan P. Gill;

(b)     Objections (a "<u>Post-Auction Objection</u>") of any Non-Debtor Counterparty related solely to the identity of, and adequate assurance of future performance provided by, the Successful Bidder, if the Successful Bidder is NOT the Stalking Horse, must (i) be in writing; (ii) state with specificity the nature of such objection, and (iii) be filed with the Bankruptcy Court and properly served on the Notice Parties so as to be received on or before 12:00 p.m. (ET) an May 15, 2020 (the "Post-Auction Objection Deadline");

(c)     Any Non-Debtor Counterparty to a Contract who fails to timely file and properly serve a Cure Cost/Assignment Objection or Post-Auction Objection as provided herein may (i) be forever barred from objecting to the Cure Costs and from asserting any additional cure or other amounts with respect to such Contract in the event it is assumed and/or assigned by the Debtor and the Debtor shall be entitled to rely solely upon the Cure Costs, and (ii) be deemed to have consented to the assumption, assignment and/or transfer of such Contract (including the transfer of any related rights and benefits thereunder) to the relevant Successful Bidder and may be forever barred and estopped from asserting or claiming against the Debtor or the Successful Bidder that any additional amounts are due or defaults exist, or conditions to assumption, assignment, and/or transfer must be satisfied under such Contract, or that any related right or benefit under such Contract cannot or will not be available to the relevant Successful Bidder;

(d)     If a Non-Debtor Counterparty files a Cure Cost/Assignment Objection satisfying the requirements of these Assignment Procedures, the Debtor and the Non-Debtor Counterparty shall meet and confer in good faith to attempt to resolve any such objection without Bankruptcy Court intervention (the "<u>Resolution Procedures</u>"). If the applicable parties determine that the objection cannot be resolved without judicial intervention in a timely manner, the Bankruptcy Court shall make all necessary determinations relating to such Cure Cost/Assignment Objection at a hearing scheduled pursuant to the following Paragraph;

(e)     Consideration of unresolved Cure Cost/Assignment Objections and Post-Auction Objections, if any, will be held at the hearing on confirmation of the Debtor's Chapter 11 plan, provided, however, that (i) any Contract that is the subject of a Cure Cost/Assignment Objection with respect solely to the amount of the Cure Cost may be assumed and assigned prior to resolution of such objection, (ii) any Assignment Objections that cannot be resolved at the Confirmation Hearing may be

considered at a later hearing to be set by the Court, and (iii) the Debtor, in consultation with the Consultation Parties, may adjourn a Cure Cost/Assignment objection in its discretion in consultation with the Consultation Parties, provided further, however, that if at the time the Confirmation Order is entered there is a dispute regarding the appropriate cure amount for any executory contract or unexpired lease, then Cash equal to the amount of all Cure Claims in dispute shall be held in the Cure Claim Reserve Fund for the benefit of the applicable counterparties in accordance with the provisions of the Assignment Procedures Order; and

(f)    a timely filed and properly served Cure Cost/Assignment Objection or PostAuction Objection will reserve the filing Non-Debtor Counterparty's rights relating to the Contract, but will not be deemed to constitute an objection to the relief generally requested in the Motion with respect to the approval of the Sale.

## VI.
## RELIEF REQUESTED

32.    By this Motion, the Debtor seeks entry of an order substantially in the form of the

Bid Procedures Order, attached hereto as **Exhibit "B"**:

(a)    approving the Bid Procedures attached as Exhibit 1 to the Bid Procedures Order;

(b)    approving the Stalking Horse APA attached as Exhibit A hereto;

(c)    approving the Bid Protections as set forth herein and in the APA;

(d)    approving the form and manner of notice of the Auction and hearing to approve the Sale (the "Sale Hearing," and the notice thereof, the "Sale Notice") attached as Exhibit 2 to the Bid Procedures Order;

(e)    approving the form and manner of the Cure Notice attached as Exhibit 3 to the Bid Procedures Order;

(f)    subject to modification as necessary, fixing certain dates and deadlines relating to the Bid Procedures, the auction, the Sale Hearing, and filing of certain related objections:

i.    **Assumption and Assignment Notice Deadline: April 10, 2020**, as the deadline by which the Debtor will file with the Court and serve on Non-Debtor Counterparties a notice identifying the proposed cure amounts for the Lease and executory contracts;

ii.    **Bid Deadline**: **5:00 p.m. prevailing Eastern Standard Time on May 11, 2020,** as the Bidding Deadline by

which Potential Bidders must deliver written copies of their bidding materials consistent with the Bid Procedures to the Debtor and others entitled to receive such copies;

iii.    **Auction: 11:00 a.m. prevailing Eastern Standard Time on May 13, 2020,** as the date on which the Auction for the Sale Assets, if one is necessary, will commence at Certilman Balin Adler & Hyman, LLP, 90 Merrick Avenue, 9th Floor, East Meadow, New York 11554;

iv.    **Sale Objection Deadline: 5:00 p.m. prevailing Eastern Standard Time on May 11, 2020,** as the deadline (the "Sale Objection Deadline") by which objections, if any, to the entry of the order approving the Sale Order (defined below) must be filed and served consistent with the Bid Procedures; and

v.    **Sale Hearing**: **To be Scheduled No later than May 18, 2020** on which the Sale Hearing will be held in the United States Bankruptcy Court;

(g)    granting related relief.

33.    Further, upon conclusion of the Sale Hearing, the Debtor seeks entry of an order (the "Sale Order"), approving (a) the sale of the Sale Assets free and clear of all Liens, and (b) the assumption and assignment of certain executory contracts and unexpired leases related to and utilized in connection with the Sale Assets to the Successful Bidder.

## VII.
## EXTRAORDINARY PROVISIONS OF THE
## PROPOSED BID PROCEDURES ORDER

34.    General Order 557 requires the Debtor to highlight any "extraordinary provisions" of the proposed Sale. The extraordinary provisions in the proposed Sale are as follows:

(a)    <u>Sale to Insider.</u>  Desmarais resigned from the Debtor's board of directors on January 10, 2020.  Notwithstanding his recent status as an insider of the Debtor, he utilized his own counsel to engage in the lengthy and substantial negotiations which were hard fought and at time contentious that led to the

Stalking Horse APA.   Both the Stalking Horse APA, as amended, and the DIP Loan Facility, as amended, contain market terms that are the hallmark of arm's-length transactions between a company comparable to the Debtor and third-party financing sources and asset purchasers.

(b)      Agreements with Management.  Closing on the Stalking Horse APA is conditioned upon, among other things, Phoenix hiring Francisco Silva, the Debtor's current Vice President of Research and Development.  *See* Stalking Horse APA Sec. 9(b)(vii).   The Debtor understands that Phoenix believes that Mr. Silva is an important part of the future of *BRTX-100* and that Phoenix has had very preliminary discussions with Mr. Silva to date, but that discussions of material terms for an employment arrangement have not yet occurred.   The Debtor believes that Mr. Silva is an important part of the Debtor's remaining workforce and executive team, however, he did not participate in the decision to enter into the Stalking Horse APA and will not be involved in making any decisions concerning whether higher or better offers exist for the Sale Assets. Accordingly, the Debtor does not view the inclusion of that provision in the Stalking Horse APA as impacting the fairness of the Sale and the proposed transaction.   The Stalking Horse APA does not provide for the hiring of or offering employment to any other personnel of the Debtor.

(c)      Use of Proceeds. Under the APA with the Phoenix, proceeds from the Sale pursuant to a competing bid will be used to pay the Expense Reimbursement. The proposed form of Sale Order also provides that the Liens existing on the Sale Assets (exclusive of the 2016/17 Loans) will attach to the net proceeds of the Sale

to the same extent, validity and priority that existed prior to the Sale after taking into account the costs of the Sale, and the Debtor shall be authorized to use such proceeds to pay any such secured claims, at the Closing, in the order of their relative priority, as allowed by the Court.

(d)      <u>Sale of Books and Records</u>.  The Stalking Horse APA provides for the sale of the Debtor's books and records related to the Sale Assets.  However, that agreement also provides for reasonable access to such records for a period of two years after the Closing so that the Estate can carry out its post-Sale duties in this case.  *See* Stalking Horse APA, Sections 2(a)(viii) and 7(c)(iii).  The Debtor submits that such arrangements are routine in asset sales and the terms of access are reasonable.

(e)      <u>Relief from Bankruptcy Rule 6004(h)</u>. The proposed form of Sale Order will contain a waiver of the stay imposed by Bankruptcy Rule 6004(h). The Debtor submits such relief is appropriate under the circumstances to maximize the value that the Debtor may realize from the sale of the Sale Assets, especially in light of the fact that the Debtor's only access to working capital is to borrow under the DIP Facility and such funding is only for thirteen weeks.

## VIII.
## <u>BASIS FOR THE RELIEF REQUESTED</u>

### A.   The Court Should Approve the Proposed Bid Procedures.

35.      Section 363 of the Bankruptcy Code authorizes a trustee to sell assets of the estate other than in the ordinary course of business and provides, in relevant part: "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate…."  11 U.S.C. § 363(b)(1).  Courts approve proposed sales of property pursuant to

§363 if the transaction represents the reasonable business judgment of the Debtor. *See Inst. Creditors of Cont'l. Air Lines, Inc. v. Cont'l. Air Lines, Inc. (In re Cont'l. Air Lines)*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty … there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *In re Moore*, 608 F.3d 253, 263 (5th Cir. 2010) ("A sale of assets under § 363 … is subject to court approval and must be supported by an articulated business justification, good business judgment, or sound business reasons."); *In re Delaware & Hudson Rv. Co.*, 124 B.R. 169, 176 (D. Del. 1991) (holding that a court must be satisfied that there is a "sound business reason" justifying the preconfirmation sale of assets); *In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (stating that the elements necessary for approval of a section 363 sale in a Chapter 11 case are "that the proposed sale is fair and equitable, that there is a good business reason for completing the sale and the transaction is in good faith"); *see also Comm. of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063 (2d Cir. 1983); *Stephens Indus. Inc. v. McClung*, 789 F.2d 386, 391 (6th Cir. 1986).

36.     If a valid business justification exists for the sale,  as it does in this case, the Debtor's decision to sell property out of the ordinary course of business enjoys a strong presumption "that the decision maker acted on an informed basis, in good faith and in an honest belief that the action taken was in the best interests of the company." *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)); *see also In re ASARCO, L.L.C.*, 650 F.3d 593, 601 (5th Cir. 2011) ("The business judgment standard in section 363 is flexible and encourages discretion."); *GBL Holding Co.v. Blackburn/Travis/Cole, Ltd.*, 331 B.R. 251, 254 (Bankr. N.D. Tex. 2005) ("Great judicial deference is given to the [t]rustee's exercise of business judgment" [in approving a proposed sale

under section 363].). Therefore, any party objecting to the proposed sale must make a showing of "bad faith, self-interest or gross negligence." *Integrated Res., Inc.*, 147 B.R. at 656 (citing *Smith v. Van Gorkom*, 488 A.2d 858, 872-73 (Del. 1985)); *see also Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re JohnsManville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D. N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct.").

37.    In determining whether a proposed § 363(b)(1) sale satisfies the "business judgment standard," courts consider the following: (a) whether a sound business justification exists for the sale; (b) whether adequate and reasonable notice of the sale was given to interested parties; (c) whether the price is fair and reasonable; and (d) whether the parties have acted in good faith. *See, e.g.*, *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991); *In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987). All of those factors are satisfied here.

38.    The Stalking Horse APA and the Bid Procedures were agreed to after the Debtor exercised its sound business judgment at the conclusion of negotiations, subject to approval by this Bankruptcy Court and are in the best interest of Debtor, creditors, and the Estate.  Aside from the Extraordinary Provisions discussed above, the Debtor believes that the proposed Bid Procedures and Assignment Procedures are of a type regularly employed in asset sales in bankruptcy particularly for a company of the Debtor's size and value, and that the Extraordinary Provisions are also many times utilized in the same circumstances.  Accordingly, the Court should approve them all.

39.    Sound business justification exists for the Sale.  The Debtor's liquidity is currently virtually non-existent, and the Debtor faces challenges to fix that limitation in the near future.

Accordingly, at this time, the proposed orderly sale of the Assets is the only viable alternative to maximize value of the Sale Assets.  The Debtor submits that a number of sound business reasons supports the proposed Sale of the Assets, and the facts support an expeditious but regulated and controlled sale of the Sale Assets to preserve value.

40.     The Debtor will place appropriate ads concerning the Auction in *Newsday* and *The New York Times* national edition and intends to use reasonable efforts to advise parties it previously approached or discussed with concerning a sale or licensing of some or all of its assets of the Sale, the Auction and the Bid Procedures.  Accordingly, notice will be given to interested parties of the Bid Procedures, the Auction, and the date of the Sale as required in the Bid Procedures Order.  The Debtor submits that such notice constitutes adequate and reasonable notice to interested parties, as set forth in the Bid Procedures Order, under the circumstances and should be approved.

41.     Under the Bid Procedures, the Debtor will have acted in good faith to canvas the market to ensure that the ultimate sales price for the Assets is the highest value possible.  The Debtor submits that the approval of the proposed Sale is appropriate and warranted under § 363 of the Bankruptcy Code.

**B.      The Bid Protections Are Reasonable**

42.     The Debtor proposes that if overbidding occurs at the Auction, Phoenix shall have the right, but not the obligation, to participate in the overbidding subject only to the limitations provided by the Bidding Procedures. However, to compensate Phoenix for serving as a "stalking horse," thereby subjecting its bid to an Auction at the Sale Hearing,  and to better or higher offers, the Debtor and Phoenix seek authority for the Debtor to pay Phoenix the Expense Reimbursement if a competing bid is approved or consummated or there is a material breach by the Debtor preventing a Closing as provided in the APA. The Debtor and Phoenix believe that the Expense

Reimbursement is (a) fair and reasonable, given the benefit to the Estate of having a definitive Stalking Horse APA and the risk to Phoenix that a third-party offer may ultimately be accepted and (b) are necessary to preserve the value of the Debtor's Estate.

43.     Courts evaluate bid incentives such as a break-up or termination fee or expense reimbursement under the "business judgment rule."  *See Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656-57 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993).  Outside of bankruptcy, that type of incentive is presumptive valid under the business judgment rule.  *Id.* at 657.  In determining whether a such fees are appropriate, courts in bankruptcy cases consider the following factors:  "(1) is the relationship of the parties who negotiated the break-up fee tainted by self-dealing or manipulation; (2) does the fee hamper, rather than encourage, bidding; (3) is the amount of the fee unreasonable relative to the proposed purchase price?"  *Id.*  If those factors are established, courts find such arrangements presumptively valid.  An expense reimbursement is justified when serving as an "incentive payment" offered to an unsuccessful bidder who places the debtor's property in a "sales configuration mode," thereby attracting other bidders to the auction.  *Id.* at 659 (quoting *In re Financial News Network, Inc.*, 126 B.R. 152, 154 n. 5 (S.D.N.Y. 1991).  Accordingly, expense reimbursements are designed to "(1) attract or retain a potentially successful bid, (2) to establish a bid standard or minimum for other bidders to follow, or (3) to attract additional bidders." *Id.* at 662.

44.     The proposed initial overbid over Phoenix's offered Purchase Price (as defined in the Stalking Horse APA) is $50,000 cash and the amount of the Expense Reimbursement.  That combined amount is projected to be approximately $300,000, which the Debtor submits is a reasonable overbid that will not chill the marketplace.

45.     Accordingly, the Debtor submits that the Expense Reimbursement and overbid amount are reasonable and rationally related to the proposed transaction and should be approved by the Court.

**C.      The Assumption and Assignment of Contracts Is
         Authorized By § 365 of The Bankruptcy Code**

46.     Section 365(a) of the Bankruptcy Code authorizes a trustee to assume, subject to the court's approval, executory contracts or unexpired leases of a debtor. In turn, 11 U.S.C. § 365(b)(1) codifies the requirements for assuming an unexpired lease or executory contract of a debtor, providing as follows:

> (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee

> A)     cures or provides adequate assurance that the trustee will promptly cure, such default …;

> B)     compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

> C)     provides adequate assurance of future performance under such contract or lease.

47.     In analyzing whether the assumption or rejection of an executory contract or unexpired lease pursuant to 11 U.S.C. § 365(a) should be approved, courts also apply the "business-judgment" test, which requires a determination that the requested assumption or rejection be "advantageous to the estate and the decision be based on sound business judgment."[3]

---

[3] See *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1098-99 (2d Cir. 1993) (holding that, when deciding whether to grant a motion to assume, a court must put itself in the trustee's position and determines whether such assumption would be a good decision or a bad one).

In making this determination, courts generally will not second-guess a debtor in possession's business judgment concerning the assumption of an executory contract.[4]

48.    Here, the Debtor's assumption and assignment of Contracts to the Successful Bidder after an Auction meets the business-judgment standard and satisfies the requirements of 11 U.S.C. § 365 of the Bankruptcy Code.  As mentioned, the Debtor's liquidity is challenged, and the Sale transactions contemplated by this process will preserve and maximize value of the Sale Assets.  Because the Debtor may not be able to obtain such preservation and maximization without the assumption and assignment of some or all of the subject Contracts, the assumption of these subject Contracts is a sound exercise of the Debtor's business judgment.  At this time, the Debtor does not know which Contracts a Qualified Bidder will seek the Debtor to assume and assign and will depend on which Contracts, if any, a Potential Bidder desires to include in its bid.  However, it is reasonably expected that all Qualified Bidders would seek to obtain the Disc IP License and possibly the Lease.  With regard to the Lease and at least one of the Debtor's research agreements with a university, the Debtor currently owes outstanding amounts under those agreements.  The Stalking Horse APA provides for such payment as part of the purchase price.  As a result, the Debtor will be able to satisfy those amounts from proceeds from the Sale thereby reducing the amount of outstanding claims against the Debtor which benefits all unsecured creditors.

49.    Furthermore, a debtor in possession may assign an executory contract or an unexpired lease of the debtor if it assumes the agreement in accordance with 11 U.S.C. § 365(a),

---

[4] *See e.g.*, *In re Paolo Gucci*, 193 B.R. 411, 414 (S.D.N.Y. 1996); *Sharon Steel Corp. v. National Gas Fuel Distrib. Corp. (In re Sharon Steel Corp.)*, 872 F.2d 36, 40 (3d Cir. 1989); *In re III Enter., Inc.*, 163 B.R. 453, 469 (Bankr. E.D. Pa. 1994) ("Generally, a court will give great deference to a debtor's decision to assume or reject an executory contract. A debtor need only show that its decision to assume or reject the contract is an exercise of sound business judgment –a standard which we have concluded many times is not difficult to meet.").

and provides adequate assurance of future performance by the assignee, "whether or not there has been a default" under the agreement. 11 U.S.C. § 365(f)(2).

50.     Here, in the event there are any unexpired leases or executory contracts to be assigned, the Debtor will identify such leases and contracts and provide for any cure amounts related thereto.  Prospective Bidders are not required to purchase such agreements but must identify any of those agreements that they seek to acquire.  All monetary defaults that must be cured under 11 U.S.C. § 365(b) as a pre-condition to the assumption and assignment of the subject Contracts will be cured at the proposed closing or the Debtor will secure an agreement for the cure of same through the sale process to the extent permitted.

51.     As outlined and discussed above, the Assignment Procedures are consistent with the requirements of § 365 of the Bankruptcy Code applicable to the assumption and assignment of the Contracts, if chosen by the Successful Bidder for assignment.  They provide for (i) ample notice to each of the Non-Debtor Counterparties of the Debtor's asserted Cure Amount; (ii) provides each of the Non-Debtor Counterparties with information from each Qualified Bidder that such counterparty can use to determine if it agrees with the Debtor that the Successful Purchaser has given adequate assurance of future performance; (iii) provides for the payment of all Cure Amounts whether as agreed to between the Debtor and the respective Non-Debtor Counterparty or by Bankruptcy Court approval; and (iv) provides a reasonable mechanism for the resolution of any disputes as between the Debtor and the respective Non-Debtor Counterparties concerning accurate cure amounts and whether adequate assurance of future performance has been shown.

52.     The Debtor submits that based on the foregoing, the Assignment Procedures and the assumption and assignment of the Contracts selected for assumption and assignment by the Successful Bidder consistent with those procedures should be approved.

**D.      The Ultimate Purchaser Will Be Entitled to
Protections as a Good-Faith Purchaser**

53.      Bankruptcy Code § 363(m) states, in relevant part:

> The reversal or modification on appeal of an authorization under
> subsection (b) or (c) of this section of a sale or lease of property does
> not affect the validity of a sale or lease under such authorization to
> an entity that purchased or leased such property in good faith,
> whether or not such entity knew of the pendency of the appeal,
> unless such authorization and such sale or lease were stayed pending
> appeal.

54.      A sale to a good-faith purchaser cannot be avoided under § 363(m), unless the sale

authorization was stayed pending appeal. *See* 11 U.S.C. § 363(m).  Additionally, for the sale to be

considered in good-faith, consideration must: (1) be fair and reasonable; (2) be the highest and

best offer for the property, and; (3) constitute reasonably equivalent value, fair value, and fair

consideration.

55.      The Debtor will show that it negotiated with the Successful Bidder at arm's-length,

in good faith, and in an effort to achieve the best offer for the Assets.  As such, the Debtor will

show that the Successful Bidder is entitled to the protections of a good-faith purchaser under 11

U.S.C. § 363(m), and the sale of the Assets does not constitute an avoidable transaction pursuant

to § 363(n).

56.      The purchaser of the Assets will have participated in a good faith manner if such

prospective purchaser complies with the Bid Procedures and submits a Qualified Bid. An Auction

conducted in accordance with the Bid Procedures will further ensure that the sale of the Assets

will be the result of arm's length, good faith negotiations between the Debtor and each party

submitting a Qualified Bid. The Bid Procedures, coupled with the prospect of an open Auction,

definitively preclude any conduct that would cause or permit the sale to be set aside under 11

U.S.C. § 363(n).

57.    Finally, the Debtor reiterates that any agreement executed with or related to the sale of the Assets will provide substantial, essential value to the bankruptcy estate because it will facilitate an efficient liquidation for fair and reasonable consideration. *Mellon Bank, NA. v. Metro Communications, Inc.*, 945 F.2d 635 (3d Cir. 1991) (same), *cert. denied,* 503 U.S. 937 (1992); *see also Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors (In re R.M.I., Inc.)*, 92 F.3d 139 (3d Cir. 1996); *In re China Resource Prod. Ltd. v. Favda Intern., Inc.*, 856 F. Supp. 856, 866 (D. Del. 1994) (citing *Geyer v. Ingersoll Publications Co.*, 621 A.2d 784, 792 (Del. Ch. 1992)).

58.    Through the Bid Procedures, exposure of the Assets will not be limited or constricted, but the Assets will instead be subjected to an open process, subject to review by the Court, that recognizes the rights of all parties-in-interest while providing the estate with reasonably equivalent value in exchange for the Assets.   The Debtor believes that the to-be-determined purchaser of the Assets is therefore a "good faith" purchaser within the meaning of Bankruptcy Code and will be entitled to the full protections afforded by 11 U.S.C. § 363(m).   Accordingly, the Debtor requests that the Sale Order contain findings and protections pursuant to Bankruptcy Code § 363(m).

**E.  The Secured Creditors and DIP Lender Consent to the Sale.**

59.    Section 363(f) of the Bankruptcy Code authorizes a trustee to sell assets free and clear of liens, claims, interests, and encumbrances in property of an entity other than the estate if

>    (1)  applicable non-bankruptcy law permits a sale of such property free and clear of such interest;
>
>    (2)  such entity consents;
>
>    (3)  such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;
>
>    (4)  such interest is in *bona fide* dispute; or

> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

60.     Because § 363(f) of the Bankruptcy Code is drafted "in the disjunctive," satisfaction of any one of its five (5) requirements will suffice to permit the sale of the Assets "free and clear" of liens and interests. *In re Nature Leisure Times, LLC*, 06-41357, 2007 WL 4554276, at *3 (Bankr. E.D. Tex. Dec. 19, 2007); *see also Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that Bankruptcy Code section 363(f) is written in the disjunctive; holding that the court may approve the sale "free and clear" provided at least one of the subsections of Bankruptcy Code section 363(f) is met); *In re Dundee Equity Corp.*, No. 89-B-10233, 1992 WL 53743, at *4 (Bankr. S.D. N.Y. Mar. 6, 1992) ("[S]ection 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met."); *In re Bygaph, Inc.*, 56 B.R. 596, 606 n.8 (Bankr. S.D. N.Y. 1986). The Court also may authorize the sale of a debtor's assets free and clear of any liens pursuant to § 105 of the Bankruptcy Code, even if § 363(f) did not apply.  *See Matter of Selby Farms*, 15 B.R. 372, 375 (Bankr. S.D. Miss. 1981) ("The power of the Bankruptcy Court to sell property free and clear of liens has long been recognized." (citing *Van Huffel v. Harkelrode*, 284 U.S. 225, 227-28 (1931))); *In re Trans World Airlines. Inc.*, No. 01-0056, 2001 WL 1820325, at *3 (Bankr. D. Del. Mar. 27, 2001) ("Bankruptcy courts have long had the authority to authorize the sale of estate assets free and clear even in the absence of § 363(f)."); *see also Volvo White Truck Corp. v. Chambersberg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) ("Authority to conduct such sales [free and clear of liens] is within the court's equitable powers when necessary to carry out the provisions of Title 11.").

61.     Here, Desmarais, as the direct and indirect holder of all of the secured claims against the Debtor, consents to the sale of the Sale Assets free and clear of all Liens, provided that either Phoenix is the Successful Purchaser or that any other party that is the Successful Purchaser pays cash for the Sale Assets in an amount not less than the total amount owed on the Bridge Loans and the DIP Loan Facility to be remitted to Desmarais and Phoenix at the time of the Closing. Accordingly, to the extent applicable, § 363(f)(2) will be satisfied based on that consent.  Further, all Liens of any secured party against the Sale Assets will attach to the proceeds from the sale of the Sale Assets to the same extent and priority as such liens exist in the Sale Assets prior to the Sale.

## F.  <u>Cause Exists to Eliminate Any Stay Imposed By The Bankruptcy Rules</u>.

62.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property … is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). Bankruptcy Rule 6006 provides that an "order authorizing the trustee to assign an executory contract or unexpired lease under 11 U.S.C. § 365(f) is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6006(d).

63.     The Debtor requests that any order approving this Motion (or authorizing a transaction to sell the Assets) be effective immediately, thereby waiving the 14-day stays imposed by Bankruptcy Rules 6004 and 6006.  These waivers or eliminations of the 14-day stays are necessary for the Sale to close and the funding to be received as expeditiously as possible.  The only working capital available to the Debtor is that borrowed under the DIP Facility which is for only a 13 week period.  The Debtor respectfully submits that it is in the best interest of its creditors and its Estate to close the Sale as soon as possible after all closing conditions have been met or

waived.  Accordingly, the Debtor requests that the Court eliminate the 14-day stays imposed by Bankruptcy Rules 6004 and 6006.

**G. <u>Notice</u>.**

64.     The Debtor will cause to serve copies of this Motion, together with the exhibits and notice of the Hearing by (i) the Court's electronic filing system on those parties receiving electronic notice by such system; (ii) first class United States mail, postage prepaid, and (iii) via electronic mail where possible, including, without limitation, on (a) the United States Trustee for the Eastern District of New York; (b) Phoenix, Tuxis Trust and Desmarais and their counsel; (c) the Debtor's landlord and its counsel, if known; (d) the entities listed on the Consolidated List of Creditors Holding the 20 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (e) the Securities and Exchange Commission; (f) the Internal Revenue Service, (g) the U.S. Department of Justice; (h) the Attorney General (NYS Dept. of Taxation and Finance); (i) all parties in interest and counsel having filed written requests for notice of appearance in this case. It will also serve all other all creditors and known parties in interest with Notice of the Hearing.

65.     The Debtor also seeks authority to publish notice of the Sale and of the Sale Hearing.

66.     The Debtor submits that such notice complies with the applicable requirements of the Bankruptcy Code and Rules, including the notice requirements of Bankruptcy Rules 2002 and 6004, and respectfully submits that no other or further notice is necessary.

**WHEREFORE**, the Debtor respectfully requests that this Bankruptcy Court enter the Bid Procedures Order in substantially the form attached as **<u>Exhibit B</u>** and thereby:

(a)     approve the Bid Procedures;

(b)     approve the Stalking Horse APA and the Bid Protections;

(c)      schedule the Auction and the Sale Hearing:

(d)      approve the Assignment Procedures; and

(e)      grant the related relief set forth herein.

Further, the Debtor respectfully requests at the conclusion of the Sale Hearing that this Bankruptcy

Court enter a Sale Order, thereby:

(a)      authorizing and approving the sale of the Assets to the party or parties that timely submit the highest and best Qualified Bid in compliance with the Bid Procedures that, in the Debtor's business judgment, constitutes the highest or best offer, in either case, free and clear of all claims, encumbrances, liens, and other interests;

(b)      authorizing and approving the assumption and assignment of Contracts; and

(b)      granting such related, other and further relief as is just and proper.

Dated: East Meadow, New York
     March 30, 2020

**CERTILMAN BALIN ADLER & HYMAN, LLP**
Proposed Counsel to the Debtor and Debtor in Possession


By:      /s/Robert D. Nosek
        Richard J. McCord, Esq.
        Robert D. Nosek, Esq.
        90 Merrick Avenue, 9th Floor
        East Meadow, New York 11554
        (516) 296-7000