**PRYOR & MANDELUP, L.L.P.**
**Attorneys for John M. Desmarais,**
**Tuxis Trust**
**A. Scott Mandelup, Esq.**
**Neil Ackerman, Esq.**
 **675 Old Country Road**
 **Westbury, New York 11590**
**(516) 997-0999**
asm@pryormandelup.com
na@pryormandelup.com

UNITED STATES BANKRUPTCY COURT       **Hearing Date: September 10, 2020**
EASTERN DISTRICT OF NEW YORK       **Hearing Time: 11:30 a.m.**
--------------------------------------------------------X

In re:                       Case No. 8-20-71757-reg

BIORESTORATIVE THERAPIES, INC.,       Chapter 11

                     Debtor.
--------------------------------------------------------X

### OBJECTION OF JOHN M. DESMARAIS AND TUXIS TRUST TO CONFIRMATION OF AMENDED JOINT PLAN OF REORGANIZATION OF BIORESTORATIVE THERAPIES, INC. AND AUCTUS FUND, LLC

      John M. Desmarais ("Desmarais") and Tuxis Trust ("Tuxis") ("Objectants"), secured creditors in the above-captioned Chapter 11 case of debtor and debtor-in- possession BioRestorative Therapies, Inc. ("Debtor"), by their attorneys, Pryor & Mandelup, L.L.P., for their Objection to the Amended Joint Plan of Reorganization of Debtor and Auctus Fund, LLC ("Auctus" and together with Debtor, the "Plan Proponents") dated August 7, 2020 (the "Plan"), respectfully state as follows:

### *Preliminary Statement*

      1.      The Plan cannot be confirmed because the Plan Proponents cannot prove, by a preponderance of the evidence, that the Plan complies with the following subsections of 11 U.S.C. § 1129:

(a) the Plan violates Section 1129(b)(2)(A) because Objectants, as the sole holders of Class 1 Secured Claims, will vote to reject the Plan and the Plan Proponents must confirm the Plan in compliance with the cramdown provisions of Section 1129(b)(2). The Plan violates 11 U.S.C. § 1129(b)(2)(A)(i)(I) by not providing for Objectants, as holders of Class 1 Secured Claims, to retain their pre-petition liens on Debtor's assets, "to the extent of the allowed amount of such claims"; and the Plan violates 11 U.S.C. § 1129(b)(2)(A)(i)(II) because the Plan Proponents have offered no evidence of the propriety under *Apollo Global Mgmt., LLC v. Bokf, NA (In re MPM Silicones, L.L.C.)*, 874 F.3d 787 (2d Cir. 2017) ("*Apollo*"), of the two interest rates proposed in the Plan[1];

(b) the Plan violates 11 U.S.C. § 1129(a)(11) because the Plan Proponents cannot demonstrate that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Reorganized Debtor as the Disclosure Statement concedes that feasibility of the Plan depends on Debtor being able to raise sufficient funds for the Phase 2 clinical trials of Debtor's *ThermoStem*™ and BRTX-100 programs, estimated by Debtor at $10.0 - $12.0 Million and estimated in Exhibit C to the Disclosure Statement as $7,749,999.99 for the first 29 months after the Effective Date, but makes no provision for and cannot justify any reasonable likelihood of Debtor or Auctus being able to raise the needed funds, which Debtor has

---

[1] Additionally, with respect to Objectants' Secured Claims under the Desmarais Note and the Tuxis Note (claim no. 20 by Tuxis Trust, for $753,835.62 as of the Filing Date, and claim no. 21 by Desmarais, for $245,191.78 as of the Filing Date) that are secured by Liens which Debtor is seeking to avoid as preferences in Adv. Proc. No. 20-8117 commenced on August 14, 2020, although Section 6.3(c)(ii) of the Plan Proponents' Amended Disclosure Statement dated August 7, 2020 expressly states that "If and to the extent that the Bankruptcy Court does not enter an order avoiding the liens that allegedly secure the Claims arising from the Desmarais Note and the Tuxis Note, then the Reorganized Debtor will be required to treat such Claims as Class 1 Secured Claims", Section 4.1(c)(ii) of the Plan does not state this. The Plan should be amended to expressly set forth the affirmative statement in Section 6.3(c)(ii) of the Disclosure Statement set forth above, that the Reorganized Debtor will treat these Claims as Class 1 Secured Claims if Debtor does not prevail in its adversary proceeding against Objectants.

been unable to raise during the last three years following the FDC's authorization to conduct Phase 2 clinical trials;

(c) the Plan violates 11 U.S.C. § 1129(a)(3) because the Plan grants Secured Convertible Plan Notes to: (i) Auctus (in the amount of $3.3 million); (ii) Auctus' approved Accredited Investors in the amount of any Plan financing they contribute; and (iii) holders of General Unsecured Claims equal to the Financing Amount they contribute to Debtor, but the Leak Out Restrictions in the Plan do not apply to these Secured Convertible Plan Notes, raising the prospect that the Plan is nothing more than a penny stock play by Auctus, which should be addressed by imposing a three year Leak Out Restriction on any stock issued to Auctus, the Accredited Investors who must be approved by Auctus, and holders of Allowed General Unsecured Claims that provide Cash to the Reorganized Debtor after the Effective Date equal to the Financing Amount; and

(d) despite being amended, the Plan still provides, in Section 9.3(a), for improper releases of any and all derivative claims that creditors or shareholders might have or assert against Auctus and its current officers, directors, agents and professionals, and any claims against Debtor's officers and directors from any act or omission that is not determined in a final order to have risen to the level of gross negligence or willful misconduct.

**The Plan Is Not Confirmable Because The Plan Proponents Cannot Establish By A Preponderance Of Evidence That the Plan Complies With 11 U.S.C. § 1129(b)(2) and § 1129(a)(3), (7), and (11)**

2.      To confirm the Plan, the Plan Proponents "must establish by a preponderance of the evidence that each of the confirmation requirements set forth in Bankruptcy Code Section 1129 has been met." *In re 20 Bayard Views, LLC*, 445 B.R. 83, 93-94 (Bankr. E.D.N.Y. 2011) ("*Bayard*").

### A.  The Plan Violates 11 U.S.C. § 1129(b)(2)(A)(i).

3.      11 U.S.C. § 1129(b)(1), provides: " Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent under the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted the plan."  Here, Section 1129(b) must be satisfied by the Plan Proponents because Class 1 consisting of Objectants' Secured Claim for the Bridge Loans, is impaired under the Plan and will not vote to accept the Plan.

### *11 U.S.C. § 1129(b)(2)(A)(i)(I)*

4.      11 U.S.C. § 1129(b)(2), provides, in part: "For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements: (A) with respect to a class of secured claims, the plan provides - (i)(I) that the holders of such claims retain the liens securing such claims, . . ., to the extent of the allowed amount of such claims".

5.      Section 4.1(c)(i) of the Plan provides for five alternative treatments of the Class 1 Claim, to be chosen at Auctus' sole option in the event that Objectants do not accept the Plan.[2]  Section 4.1(c)(i)(2) provides for payment in full of Class 1 Claims on the Effective Date but there is certainly no guarantee and little likelihood that Auctus will elect to provide that treatment to Objectants' Claim.  The remaining two options are Section 4.1(c)(i)(1) which provides for monthly payments of principal and interest based on an

---

[2] Section 4.1(c)(5) is whatever treatment the Court determines is necessary to give Objectants the indubitable equivalent of their Class 1 Claims.  Section 4.1(c)(4) is whatever treatment on which the Objectants and Auctus may agree.  Neither of these is likely nor specified in any detail and are, therefore, not subject to any analysis and cannot serve as a potential basis for confirmation.

interest rate of 4.25% per annum and a 20 year amortization schedule "with all unpaid principal and interest due at the end of 60th month following the Effective Date" and Section 4.1(c)(i)(3) which would give Objectants a Secured Convertible Plan Note in the amount of their allowed Class 1 Secured Claim.  The Plan provides that the Secured Convertible Plan Note will bear interest at 7% per annum.  The Plan makes no mention of when payments will be made under the Secured Convertible Plan Note and the form of such Note has not been provided.

6.      Section 4.1(f) of the Plan states: "To secure the payment of Class 1 Allowed Secured Claims and except as modified by the Plan, the holder of such Claims shall retain their Liens to the extent, validity and priority of such Liens as of the Petition Date."  Section 1.71 of the Plan defines Secured Convertible Plan Note as a note secured by a Plan Lien. Section 1.59 of the Plan defines Plan Lien as "A Lien on substantially all assets of the Reorganized Debtor."  However, the Plan provides for various Plan parties, in addition to holder of Class 1 Claims, to receive Secured Convertible Plan Notes, including Accredited Investors (§ 5.2), holder of General Unsecured Claims who elect to fund the Plan (§.4.3(c)(ii)), and Auctus (§ 5.2).  As a result, the Lien of Objectants on all assets of Debtor for the Bridge Loans, which is currently only subordinate to the Auctus DIP Obligation, will be further diluted by or subordinated to the Secured Convertible Plan Notes to be issued to (i) Auctus, in the amount of $3.3 million (110% of the aggregate of the Minimum Contribution, the DIP Obligation and the Plan Costs (Plan § 5.2)[3], (ii) holders of General Unsecured Claims who contribute to financing for the Plan (Plan § 4.3(c)(ii)(2)), and (iii) Accredited Investors who contribute Plan financing (Plan § 5.2).  As a result, Objectants

_____

[3] The Plan is not clear as to the priority of the Auctus Secured Convertible Plan Notes over other Secured Convertible Plan Notes to be issued under the Plan but it is a fair presumption that Auctus intends that its Secured Convertible Plan Notes will have the same super priority granted.

will not be retaining their pre-petition Lien "to the extent, validity and priority of such Liens as of the Petition Date."  Accordingly, the Plan cannot be confirmed.

### *11 U.S.C. § 1129(b)(2)(A)(i)(II)*

7.    In order to confirm the Plan without its acceptance by Class 1, 11 U.S.C. § 1129(b)(2)(A)(i)(II) requires "that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property".  The Amended Disclosure Statement states that the Class 1 Claim is in the amount of approximately $357,000.  As filed, Objectants' Class 1 Claim is in the amount of $356,836.03 plus attorneys' fees.  The Plan Proponents have made no suggestion that the Class 1 Claim is not fully secured or over secured.  To the extent that the Plan provides for any treatment other than payment in full on the Effective Date, the Class 1 Claim is entitled to interest at an appropriate rate.

8.    In *Till*, *supra*, a plurality of the Supreme Court held that in Chapter 13 cases, secured creditors being paid over time are entitled to interest for their risk of payment based on a formula of the prime interest rate plus one percent to three percent.  541 U.S. 465, 480.  *See also, Valenti, supra,* 105 F.3d 55, 64 (applying in Chapter 13 interest rate of U.S. Treasury Board with same maturity as Chapter 13 plan plus a risk premium of 1%-3%).  The *Till* formula has been used by bankruptcy courts to determine the rate of interest to be paid to secured creditors in Chapter 11 cramdown situations.  *See, In re MPM Silicones, LLC,* 2014 Bankr. LEXIS 3926 at *72-86 (Bankr. S.D.N.Y. Sept. 9, 2014), *aff'd*, 531 B.R. 321 (S.D.N.Y. 2015), *aff'd in part and rev'd in part, sub nom, Apollo Global Mgmt., LLC v. Bokf, NA (In re MPM Silicones, L.L.C.),* 874 F.3d 787 (2d Cir. 2017) ("*Apollo*").

9.     In *Apollo*, the Second Circuit Court reversed the bankruptcy court and district

court, both of which had declined to follow the Sixth Circuit decision in *In re American*

*HomePatient, Inc.* 420 F.3d 599 (6th Cir. 2005), and strictly applied the *Till* formula in

determining a Chapter 11 secured creditor's cramdown interest rate.  The *Apollo* decision

held:

> The rate selected by the lower courts for the Senior- Lien Note
> holders' replacement notes was based on the "formula" rate.
> The bankruptcy court selected interest rates of 4.1% and 4.85%,
> respectively, which were largely risk-free rates slightly adjusted
> for appropriate risk factors.  It is not disputed that this rate is
> below market in comparison with rates associated with
> comparable debt obligations.  The Debtors defend the
> application of the "formula" method on the ground that it is
> required by the plurality opinion in the Chapter 13 case of *Till*
> *v. SCS Credit Corp.,* 541 U.S. 465.  . . .
>
>                                    . . . .
> The Senior-Lien Note holders contend that because this rate is
> too low, the Plan is not "fair and equitable" as required by §
> 1129(b).  They argue that the lower courts should have applied
> a market rate of interest which is the rate MPM would pay to a
> contemporaneous sophisticated arms-length lender in the open
> market.  The Senior-Lien Note holders argued in the bankruptcy
> court that such a market exists and would generate interest in
> the 5-6+% range.  . . .
>
>                                    . . . .
> The bankruptcy court rejected this approach, and concluded that
> a cramdown interest rate should "not take market factors into
> accounts.".  . .  Viewing itself as "largely governed by the
> principles enunciated by the plurality opinion in *Till*).  . . " it
> concluded that the proper rate was what the plurality in *Till*
> referred to as the "formula" or "prime-plus" rate.  . .  The
> district court agreed.  . . .
>
>                                . . .
> The "formula" approach endorsed by the Till plurality instructs
> the bankruptcy court to begin with a largely risk-free interest
> rate, specifically, the "national prime rate.  . .  which reflects
> the financial market's estimate of the amount a commercial
> bank should charge a creditworthy commercial borrower to
> compensate for the opportunity costs of the loan, the risk of
> inflation, and the relatively slight risk of default." . . .  The
> bankruptcy court should then hold a hearing to determine a

proper plan-specific risk adjustment to that prime rate "at which the debtor and any creditors may present evidence." *Id.*  Using this approach, "courts have generally approved adjustments [above the prime rate] of 1% to 3%.  .  .  .

The Till plurality arrived at the "formula" rate after rejecting a number of alternative methods relied on by the lower courts. Significantly, it rejected methods relying on purported "market" rates of interest because those rates "must be high enough to cover factors, like lenders' transactions costs and overall profits, that are no longer relevant in the context of court administered and court-supervised cramdown loans.".  .  . The plurality then identified the only factors it viewed as relevant in properly ensuring that the sum of deferred payments equals present value: (i) the time-value money; (ii) inflation; and (iii) the risk of non-payment.  .  .  .   The plurality concluded that the "formula" or "prime-plus" method best reflects those considerations.
                                           .  .  .
.  .  .  the plurality made no conclusive statement as to whether the "formula" rate was generally required in Chapter 11 cases. And, notably, the plurality went on to state, in the opinion's much-discussed footnote 14, that the approach it felt best applied in the Chapter 13 context may not be suited to Chapter 11.  Specifically, in that footnote, the Court stated that in Chapter 13 cramdowns "there is no free market of willing cramdown lenders." .  .  .  It continued: "[i]nterestingly, the same is not true in the Chapter 11 context, as numerous lenders advertise financing for Chapter 11 debtors in possession.  Thus, when picking a cramdown rate in a Chapter 11 case, it might make sense to ask what rate an efficient market would produce." *Id.*  .  .  .  .

Many courts have relied on footnote 14 to conclude that efficient market rates for cramdown loans cannot be ignored in Chapter 11 cases.  Most notably, the Sixth Circuit, "tak[ing] [its] cue from Footnote 14" of the Till plurality, adopted a two-part process for selecting an interest rate in Chapter 11 cramdowns:

> [T]he market rate should be applied in Chapter 11 cases where there exists an efficient market.  But where no efficient market exists for a Chapter 11 debtor, then the bankruptcy court should employ the formula approach endorsed by the Till plurality.

*In re AmericanHomePatient, Inc.,* 420 F.3d 559, 568 (6th Cir. 2005).  In applying this rule, courts have held that markets for financing are 'efficient' where, for example, "they offer a loan with a term, size, and collateral comparable to the forced loan contemplated under the cramdown plan."  *In re Texas Grand Prairie Hotel Realty*, *L.L.C.,* 710 F.3d 324, 337 (5th Cir. 2013)

We adopt the Sixth Circuit's two-step approach, which, in our view, best aligns with the Code and relevant precedent.  We do not read the Till plurality as stating that efficient market rates are irrelevant in determining value in the Chapter 11 cramdown context.  And, disregarding available efficient market rates would be a major departure from long-standing precedent dictating that "the best way to determine value is exposure to a market.".  .  .  .

When dealing with a sub-prime loan in the Chapter 13 context, "value" can be elusive because the market is not necessarily efficient and the borrower is typically unsophisticated.  However, where, as here, an efficient market may exist that generates an interest rate that is apparently acceptable to sophisticated parties dealing at arms-length, we conclude, consistent with footnote 14, that such a rate is preferable to a formula improvised by a court.  *See Bnk of America,* 526 U.S. at 457; *see also GMAC V. Valenti (In re Valenti),* 105 F.3d at 63 (the goal of the cramdown rate "is to put the creditor in the same economic position that it would have been in had it received the value of its allowed claim immediately"); .  .  .  .

We understand that the complexity of the task of determining an appropriate market rate will vary from case to case.  In some cases the task will be straightforward, in others it will be more complex.  But, at the end of the day, we have no reason to believe the task varies materially in difficulty from the myriad tasks which we regularly rely on the expertise of our bankruptcy courts to resolve.

We therefore conclude that the lower courts erred in categorically dismissing the probative value of the market rates of interest.  We remand so that the bankruptcy court can ascertain if an efficient market rate exists and, if so, apply that rate, instead of the formula rate.

*Id.* at 798-801.  *See also, Wells Fargo Bank N.A. v. Tex. Grand. Prairie Hotel Realty, L.L.C.*

*(In re Tex. Grand Prairie Hotel Realty, L.L.C.)*, 710 F.3d 324, 331 (5th Cir. 2013) (rejecting

use of *Till* formula in Chapter 11); *In re 20 Bayard View, LLC,* 445 B.R. 83, 105-106

(Bankr. E.D.N.Y. 2011) (cited by *Apollo*, 874 F.3d at 801, n. 10, as one of the cases in the

Second Circuit adopting for determination of Chapter 11 secured creditor cramdown interest

rates, the analysis of the Sixth Circuit in *In re American HomePatient)*; *DBSD North*

*America, Inc.*, 419 B.R. 179, 209 (Bankr. S.D.N.Y. 2009), *aff'd sub nom.*, *Sprint Nextell*

*Corp. v. DBSD N. Am. Inc.,* 2010 U.S. Dist. LEXIS 33253, 2010 WL 1223109 (S.D.N.Y.

Mar. 24, 2010), a*ff'd in part, rev'd in part sub nom.*, *Dish Network Corp. v. DBSD N. Am.*

*Inc.,* 634 F.3d 79 (2d Cir. 2011) ("In determining the appropriateness of a proposed

cramdown interest rate, courts in this district have looked to the market interest rate for

loans with similar terms.  Still other courts have considered the pre-petition contract rate in

determining whether the cramdown interest rate is sufficient."); *Mercury Capital Corp. v.*

*Milford Conn. Assocs., L.P. (In re Milford Conn. Assocs., L.P.)* 354 B.R. 11-12 (Bankr. D.

Conn. 2006) (adopting two-step Sixth Circuit analysis).

  10. As the *Bayard* court noted, "To determine whether there is a market for the

loan at issue, most courts look to expert evidence and evidence of actual loan offers.  . .

consideration should be given to the 'current market rates' for loans that are 'similar in term,

quality of security, and risk of repayment or financial condition of the borrower.'.  . . 'The

interest rate under an original loan agreement is informative as to a proposed cramdown

interest rate's merits to the extent that the original rate was set near in time to a debtor's

chapter 11 proceeding in a period in which market conditions were substantially similar to

present conditions."  *Id.* at 109 (internal citations omitted).

  11. Here, one of the options for treatment of the Class 1 Claims which Auctus

may elect in the event Objectants' reject the Plan, which they will, is an interest rate of

4.25% per annum with a 20 year amortization and payment of all unpaid principal in interest at the end of the sixtieth month following the Effective Date.  Another treatment, which Auctus may elect, is to have the Reorganized Debtor issue a Secured Convertible Plan Note in the amount of the allowed Class 1 Claims, which Note will have a maturity date of 36 months after the Effective Date and an interest rate of 7.0% per annum.  The secured notes given to Auctus in exchange for the DIP Facility bear interest at the rate of 8% per annum.

12.    Here, Objectants' Class 1 Claim is based on the two Bridge Loans made to Debtor on February 20, 2020 in the principal amount of $320,200.49 and on February 26, 2020 in the principal amount of $33,561.50, accruing interest at the rate of 12% per annum in both Notes.  *See*, Claim No. 22.  As of the Petition Date, March 20, 2020, the Debtor owed Desmarais $356,836.03 on the two Bridge Notes. (See Amended Disclosure Statement at p. 12; Claim No. 22.)  The Bridge Loans were entered into by Debtor one month or less prior to the Petition Date and reflect a market rate of interest.

13.    By comparison to either of the Bridge Loans or the DIP Facility, the two Plan options (4.25% and 7.0%) propose to pay Class 1 creditors interest at a below market rate and below the rate to be paid to Auctus.  Certainly, the Plan Proponents have made no attempt to offer any evidence to satisfy the standards of *Apollo* and have made no provision for the mandatory evidentiary hearing to determine the appropriate cramdown rate of interest.  Accordingly, the Plan does not comply with 11 U.S.C. § 1129(b) as interpreted by the Second Circuit and confirmation must be denied.

**B.  The Plan Violates 11 U.S.C. § 1129(a) (11) because the Plan
Proponents Cannot Show that Confirmation is Not Likely
to be Followed by Liquidation or Further Reorganization.**

14.    11 U.S.C. § 1129(a)(11) requires that "[c]onfirmation of the plan is not

likely to be followed by the liquidation, or the need for further financial reorganization, of

the debtor or any successor to the debtor under the plan, unless such liquidation or

reorganization is proposed in the plan."  Based on the Amended Disclosure Statement, the

Plan and prior statements by Debtor and Auctus in this case, the Plan Proponents cannot

meet their burden of proving that confirmation is not likely to be followed by the liquidation

or further financial reorganization of the Debtor.

### *The Clinical Trials Financing*

15.    The Amended Disclosure Statement states (¶8.1): "Following the Effective Date,

the Reorganized Debtor will raise additional financing, pursuant to Section 5.2 of the Plan, to

proceed with clinical trials for its ThermoStem™ Program and for BRTX-100 program, the

projected costs of which are set forth in Exhibits C-1 and C-2.  Accordingly, the Proponents

submit that the Plan is feasible."  (Emphasis supplied.)  Thus, the Plan Proponents condition the

feasibility of the Plan on Debtor's ability to raise the funds necessary for clinical trials by the

method provided in Section 5.2 of the Plan.  Sections 5.2 and 1.43 of the Plan provide for up to

$15.0 million of financing to be raised from holders of Allowed General Unsecured Claims that

provide Cash to the Reorganized Debtor under Section 4.3(c)(ii) of the Plan, and Accredited

Investors, subject to Auctus' approval, who will receive Secured Convertible Plan Notes and one

Plan Warrant for each dollar of financing.

16.    The Declaration of Mark Weinreb ("Mr. Weinreb"), the Debtor's Chief Operating

Officer, under Local Bankruptcy Rule 1007-4, filed with this Court on March 20 (ECF no. 3)(the

"Declaration") explains the nature of the Debtor's business, as follows:

> BRT develops therapeutic products and medical therapies using cell and tissue protocols, primarily involving adult stem cells. It is currently pursuing its Disc/Spine Program with an initial investigational therapeutic product called BRTX-100. In February 2017, the Debtor received authorization from the Federal Drug Administration (the "FDA") to commence a Phase 2 clinical trial investigating the use of BRTX-100, the Debtor's lead cell therapy candidate, in the treatment of chronic lower back pain arising from degenerative disc disease. Prior to the bankruptcy filing, we intended to commence such clinical trial and made numerous attempts at raising sufficient funding in order to start such trial. **The funding necessary to start that trial is approximately $10MM – 12MM with additional substantial funding necessary to complete it.**

Declaration at ¶¶ 5-6 (emphasis supplied.)

17.     Debtor's Emergency Motion filed on March 24, 2020 (ECF no. 10 at ¶10) and

Debtor's Motion filed on March 30, 2020 (ECF no. 30 at ¶11) also discuss Debtor's need for

financing for the clinical trials.

18.     Mr. Weinreb, filed a Further Declaration with this Court on March 30, 2020 (ECF

no. 31 at ¶12) (the "Further Declaration") describing the Debtor's unsuccessful efforts to raise

the necessary funding before the Debtor filed its Chapter 11 Petition with this Court on February

20, 2020 (the "Filing Date"):

> During the past year, the Debtor directly and through retained professionals reached out to numerous persons and entities, including individuals, medical device companies, healthcare funds, cell therapy companies, and pharmaceutical companies, in an attempt to summon interest by these entities to make a financial commitment to our programs through primarily licensing or purchasing structures. The discussions targeted a plethora of industries and the full range of company sizes and value. **There was no interest in acquiring outright any of the Debtor's programs or technology, or the Company itself.**  In

> addition, the Debtor was advised that any potential interest in the technology would only occur after a successful clinical trial of BTRX-100 **(which the Debtor has yet to start and is unable to commence due to a lack of funding).** After contacting over 70 parties involved in degenerative disc disease, back pain, devices to treat the spine and general regenerative medicine, **no parties expressed adequate interest to offer any indication to partner, acquire or license the Debtor's programs.**

(Emphasis supplied.)

19.     Section 4.4 of the Disclosure Statement and the Amended Disclosure Statement

states:

> Subsequent to the FDA issuing its approval for the Debtor to commence a Phase 2 trial of BRTX-100, the Debtor engaged in efforts to raise funds sufficient to start such trial.  While the Debtor had some success raising funds in order to sustain its operations, those efforts were not successful in raising sufficient funds to commence the Phase 2 trial.  The Debtor's efforts continued during the year prior to the Petition Date, with the Debtor directly and through retained professionals reaching out to numerous persons and entities, including individuals, medical device companies, healthcare funds, cell therapy companies, and pharmaceutical companies, in an attempt to summon interest by these entities to make a financial commitment to the Debtor's programs through primarily licensing or purchasing structures.  Those discussions targeted a plethora of industries and the full range of company sizes and value. There was no interest in acquiring outright any of the Debtor's programs or technology, or the Company itself.  In addition, the Debtor was advised that any potential interest in the technology would only occur after a successful clinical trial of BRTX-100 (which the Debtor has yet to start and is unable to commence due to a lack of funding). After contacting over 70 parties involved in degenerative disc disease, back pain, devices to treat the spine and general regenerative medicine, no parties expressed adequate interest to offer any indication to partner, acquire or license any of the Debtor's programs.

20.     Objectant Desmarais, who was a member of the Debtor's Board of Directors until

resigning on January 10, 2020, understands that the Phase 2 trial will take approximately a year

and a half to complete and will ultimately cost around $15 million.  Further, if the Phase 2 trial is

successful, the Debtor will then have to go through a Phase 3 trial, which requires many more

patients, will take approximately two more years, and will cost at least $100 million.  The

Amended Plan concedes that the Debtor does not have the funds needed to pay for Phase 2 trials

on its own and says those funds will be raised under Section 5.2 of the Plan.  When the $10-$12

million to fund the Phase 2 trial is added to the First Year Projected Operating Costs and the

Effective Date payments, discussed below, the total needed to be raised by Debtor is between

$13,078,934 and $15,078,934 (the "Total Plan/Operating/Trial Costs").

21.    By the Plan Proponents' own admission, the feasibility of the Plan and the

likelihood of the Reorganized Debtor not being liquidated or requiring further financial

reorganization is entirely dependent on Debtor raising $7,749,999.99 within 29 months of the

Effective Date (see, Ex. C to Amended Disclosure Statement) and on Debtor raising a total of

$10-12 million, when Debtor has been unable to raise any portion of that essential funding in the

three years since the FDA authorized Phase 2 testing.  Accordingly, the Plan Proponents cannot

meet their burden of satisfying 11 U.S.C. § 1129(a)(11) and the Plan cannot be confirmed.

### First Year Projected Operating Costs and Plan Payments

22.    Exhibit B to the Amended Disclosure Statement sets forth that the Debtor's

annual operating costs during the year following confirmation of the Plan (the "First Year

Projected Operating Costs") will total $2,394,434.  Section 8.1 of the Amended Disclosure

Statement asserts that the Plan is feasible and that the Debtor's $2,394,434 First Year Projected

Operating Costs, and the Effective Date payments proposed under the Plan (as reviewed below,

$684,500), which total $3,078,934 will be able to be fully paid, as follows:

> Auctus and its advisors have prepared projections
> (collectively the "Projections") for the anticipated post-
> Effective Date operating costs, attached as Exhibit B and
> for the clinical trials for the *ThermoStem*™ Program and
> BRTX-100 program, attached as Exhibit C-1 and Exhibit

-15-

C-2, respectively. The projections for the post-confirmation Effective Date period include projected payments under the Plan, other than the payments due on or about the Effective Date, which are estimated to be approximately $684,500, consisting of: (a) payments to the Convenience Class, which are estimated to be not more than $70,000, (b) cure claims for assumed leases and contracts, which are estimated to be not more than $65,000, (c) Professional Fee Claims, in the estimated amount of approximately $82,500 of fees and expenses that will be incurred by the Debtor's retained professionals through August 31, 2020, net of retainer monies funded or to be funded under the DIP Facility and held or to be held by the Debtor for the payment of allowed professional fees., (d) Priority Claims, estimated to be not more than $110,000, and (e) a contingent amount of approximately $357,000 to the holder of the Class 1 Allowed Secured Claim, the payment of which is contingent on the treatment the holder of such claim receives under the Plan.

The Reorganized Debtor's operations following the Effective Date will be funded by the financing obtained pursuant to Sections 4.3(c)(ii) and 5.2 of the Plan, both before and after confirmation of the Plan.

23.    Section 4.3(c)(ii) of the Plan provides for financing of the Plan by holders of Allowed General Unsecured Claims who, in exchange for such financing, will receive a Convertible Plan Note equal to the amount of their Allowed General Unsecured Claim plus a Secured Convertible Plan Note equal to the amount financed by such creditor and a Plan Warrant for each dollar of financing.

24.    In addition, per Section 1.51 of the Plan, the Plan and the Reorganized Debtor's ongoing operations are to be funded by Auctus' Minimum Contribution, defined as "the amount of $3,000,000, less the Plan Costs and the DIP Obligation". The Amended Disclosure Statement (p. 34) states that Auctus is only obligated to make the Minimum Contribution, "[p]rovided that at least $2,000,000 in other financing raised prior to confirmation of the Plan", and Section 10.1 of the Plan makes the $2.0 million of additional financing a condition precedent to the

effectiveness of the Plan.  Thus, the commitment being made by Auctus, to fund the First Year Projected Operating Costs and the Effective Date Payments is (a) expressly conditioned on at least $2,000,000 in other financing being raised prior to confirmation of the Plan (the "Auctus Funding Condition") **before Auctus will invest any more money into the Debtor**, and (b) if, and only if, this funding condition is somehow satisfied, Auctus is limited to providing up to $3 million additional financing **<u>less</u>** (a) the DIP Obligation (defined in § 1.31 of the Plan to mean "all amounts, including principal, interest, costs and fees, owed to Auctus on account of the debtor-in-possession loans made to the Debtor by Auctus during the Bankruptcy Case"), and (b) Plan Costs (defined in § 1.57 of the Plan to mean "the costs incurred by Auctus to be a proponent of the Plan, including, without limitation, attorneys' fees and costs, consultants' fees and costs, and out of pocket costs and expenses").

25.    The Amended Disclosure Statement (p. 16) states the following as to the DIP Obligation owed to Auctus: "[a]s of July 1, 2020, Auctus fully funded the approximately $713,000 of the Auctus DIP Facility, and the Bankruptcy Court has approved an extension of that facility for an additional eight (8) weeks with an additional funding of approximately $401,000 on substantially the same terms as currently exist."  Auctus' Plan Costs, defined in Section 1.57 of the Plan as "the costs incurred by Auctus to be a proponent of the Plan, including without limitation, attorneys' fees and costs, consultants' fees and costs, and out of pocket expenses" are unknown, and the Amended Disclosure Statement nowhere sets forth even a projection of Auctus' Plan Costs.   Therefore, Auctus is not committing to invest the $3,078,934 needed to pay First Year Operating Costs and the Effective Date payments.  Instead, Auctus is only committing to invest additional funds, (a) if the $2.0 million Auctus Funding Condition is satisfied, and (b) only up to not more than $1,886,000 ($3.0 million less at least $1,114,000 (the

principal amount of the DIP Obligation) plus interest, and less Plan Costs in an unknown and undescribed sum.

26.      In short, feasibility of the Plan and the viability of the Reorganized Debtor are wholly contingent on the Debtor somehow obtaining, prior to confirmation of the Plan, legally binding commitments for the $2.0 million (the "Financing Amount") needed to satisfy the Auctus Funding Condition, before Auctus will infuse any further funds into Debtor to pay the First Year Projected Operating Costs and the Effective Date Payments.  The potential sources for the requisite $2.0 million are: (i) commitments for new cash to be infused by holders of Allowed General Unsecured Claims in exchange for Secured Convertible Plan Notes on or before the Effective Date; and (ii) cash infusions from unknown "Accredited Investors" - subject to the approval of Auctus in exchange for Secured Convertible Plan Notes.  If Debtor can somehow raise the $2.0 million needed to trigger Auctus' obligation to fund the balance of the First Year Projected Operating Costs and the Effective Date Payments, Debtor must still raise sufficient funds to pay the $10 million-$12 million needed for the Phase 2 trial.

27.      The Plan's feasibility is therefore subject to proverbial "high hopes" that holders of Allowed General Unsecured Claims and unknown Accredited Investors will commit to invest 2.0 million, before the confirmation hearing, and that those same creditors/investors or other unidentified investors will invest $10-$12 million in the Reorganized Debtor, when no one has been willing to do so for the last three years, despite Debtor's active efforts to attract investors.

29.  In reality, this Plan leaves the Debtor in much the same position as it was before it filed its Chapter 11 Petition, except that Auctus *might* fund up to not more than $1,886,000 of the Total Plan/Operating/Trial Costs, if and only if the Auctus Financing Condition is satisfied by

obtaining $2.0 million of commitments for investments from creditors and/or Accredited

Investors, prior to the Effective Date, even though there are no prospective Investors or financing

Creditors revealed in the Amended Disclosure Statement.[4]

28.    The Plan is highly speculative, to say the least, and the Plan Proponents offer no

reasons why Debtor should be any more successful now in raising $2.0 million before

Confirmation from third parties, or the additional $10 million to $12 million needed for Phase 2

trials, when the Debtor has been unable to raise any funds for several years, despite exhaustive

efforts.  The purpose of the feasibility test in Section 1129(a)(ii) is "to prevent confirmation of

visionary schemes which promise creditors and equity holders more under a proposed plan than

the debtor can possibly attain after confirmation.'.... [W]here the financial realities do not support

the proposed plan's projections or where proposed assumptions are unreasonable, confirmation

of the plan should be denied." *In re 231 Fourth Ave. Lyceum, LLC*, 506 B.R. 196, 202 (Bankr.

E.D.N.Y. 2014).  *See also, e.g.*, *In re 8315 Fourth Ave. Corp.*, 172 B.R. 725, 735 (Bankr.

E.D.N.Y. 1994); *In re Prudential Energy Co.,* 58 B.R. 857, 862 (Bankr.S.D.N.Y.1986) (a plan

based on impractical or visionary expectations cannot be confirmed).In *In re 8315 Fourth Ave.

Corp.*, 172 B.R. 725, 735 (Bankr. E.D.N.Y. 1994), Judge Duberstein cited approvingly *Investors

Fla. Aggressive Growth Fund, Ltd.,* 168 B.R. 760, 765 (N.D. Fla. 1994)*, which concluded that

where

> [a debtor] believes a sale of the property or its refinancing will enable it
> to carry out the Plan, the Debtor is relying on a: veritable pot of gold at

---

[4] The Amended Disclosure Statement (p. 34) provides that the Plan Proponents must obtain commitments for the requisite $2.0 million Financing Condition by the Effective Date but do not explain how the Court and creditors will know at the confirmation hearing whether or not this condition for confirmation has been met.  In addition, the form of the commitment to be obtained from the Accredited Investors has not been provided, making it impossible for the Court and creditors to know if such commitments will be legally binding on the contributing Holders of Allowed General Unsecured Claims and Accredited Investors.

> the end of the rainbow. . . .  Plans which extensively rely on the sale or
> refinance of real property that constitutes a debtor's primary or sole
> significant asset, and where the asset has been a marginal performer to
> date, are inherently speculative and invite close judicial scrutiny of the
> assumptions of the underlying plan.

29.    Here, the Debtor's Plan fits squarely in the rubric of "inherently speculative", but it is also potentially harmful to creditors and Accredited Investors.  Should Debtor and Auctus induce existing creditors or new investors to infuse new funds into Debtor in exchange for Secured Convertible Plan Notes, without any feasible plan to raise the $10-12 million of capital needed to conduct Phase 2 testing, those creditors and investors are likely to lose their investments.  The Court should not give its approval to such a highly speculative Plan that may cause real injury to those who invest in it and which provides virtually no benefit to creditors.

### C.   The Plan Violates 11 U.S.C. § 1129(a)(3) Because the Plan Proponents Cannot Prove that the Plan has been Proposed in Good Faith.

30.    Section 5.1 of Plan concerning "Plan Implementation", provides, "The Plan and the Reorganized Debtor's post-Effective Date operations will be funded from the cash received in exchange for Secured Convertible Plan Notes, including the Minimum Contribution, and from any other financing as maybe authorized pursuant to the Reorganized Debtor's Organization Documents or applicable law."

31.    Under Section 1.51 of the Plan, Auctus is to receive a Secured Convertible Plan Note under Section 5.2 of the Amended Plan in the amount of its Minimum Contribution ($1,886,000 less Auctus' interest, costs and fees).[5]

---

[5] Section 5.2 of the Plan, entitled "Secured Convertible Plan Notes," provides in part, "In consideration of the Minimum Contribution, Auctus shall receive two or more Secured Convertible Plan Notes in an amount equal to one-hundred ten percent (110 %) of the aggregate of the Minimum Contribution, the DIP Obligation and the Plan Costs.  The Secured Convertible Plan Note received by Auctus in exchange for the DIP Obligation in an amount equal to one-hundred ten percent (110%) of the DIP Obligation shall be issued in accordance with the Section 1145(a)(1) of the Bankruptcy Code.  Auctus shall also receive a Secured Convertible Plan Note for any amount of financing it provides to the Debtor in excess of the Minimum Contribution."  If Section 5.2 is read literally, in

32.     Section 2.2(d) of the Plan (dealing with administrative claims) provides that the Auctus DIP Obligation shall "be exchanged on or promptly after the Effective Date for a Secured Convertible Note Plan in an amount equal to one hundred percent (110%) of the DIP Obligation."[6]  If the parenthetical in Section 2.2(d) is to be read as additional consideration to that provided to Auctus in Sections 1.51 and 5.2, then Auctus will receive Secured Convertible Plan Notes equal in value to $3.3 million under Section 5.2 of the Plan **plus** 110% of the DIP Obligation under this provision ($1,114,000 plus interest, costs and fees) = not less than $1,225,400 for total Secured Convertible Plan Notes - well in excess of $4,525,400.  Debtor's counsel has advised Objectants' counsel that the intent of the Plan Proponents is that Auctus will only receive Secured Convertible Plan Notes equal to 110% of $3.0 million under the Plan.  The Plan should be amended accordingly.

33.     Section 5.2 of the Plan also provides that Accredited Investors may commit to provide financing to the Reorganized Debtor after the Effective Date in increments of $1,000 in exchange for Secured Convertible Plan Notes in the amount of the financing and one Plan Warrant for each dollar of such financing.  Section 4.3(c)(i) of the Plan permits holders of Allowed General Unsecured Claims to receive "shares of Common Stock in the Reorganized Debtor in an amount equal to the allowed amount of the General Unsecured Claim multiplied by one hundred (100)" and, under Section 4.3(c)(ii), if the General Unsecured Creditor provides Cash to the Reorganized Debtor after the Effective Date, it is to receive a Secured Convertible Plan Note equal to the Financing Amount and one Plan Warrant for each dollar of Financing

---

consideration of the Minimum Contribution (which will be something less than $1,886,000, after interest, costs and fees are deducted) Auctus will receive Secured Convertible Plan Notes in an amount equal to 110% of the aggregate of the Minimum Contribution, the DIP Obligation and the Plan Costs, which total $3.0 million.  Thus, Auctus will receive Secured Convertible Plan Notes in the amount of $3,300,000.

[6] Presumably the intent is 110% of the DIP Obligation.

34.     Section 1.61 of the Plan defines "Plan Warrants" as "(a) one (1) Common Stock purchase warrant per dollar of Financing Amount permitting the holder to purchase a certain amount of the Common Stock and an exercise price equal to $0.0002 per share with a cash call option permitting the Reorganized Debtor to redeem such warrant in the event that such warrant is registered in an effective registration statement for a price equal to the exercise price.  .  . ; and (b) one (1) Common Stock purchase warrant per dollar of the Financing Amount permitting the holder to purchase a certain amount of the Common Stock at an exercise price equal to $0.0004 per share."  Section 8.2 of the Amended Disclosure Statement states: "The Proponents have not projected the value of such Common Stock [to be given to Allowed General Unsecured Claims and Allowed Equity Interests] on the Effective Date, but if the Reorganized Debtor can successfully develop its technology, the Common Stock may increase in value.  Since the Petition Date, the Debtor's stock has generally been trading at between $0.0001 and $0.0002 per share.  If the Debtor's share price continues to trade in that range after the Effective Date, a creditor electing to receive one hundred shares per each $1.00 of unsecured debt would receive value of between $0.01 and $0.02 on that debt.  Naturally in the event that share price increases because the marketplace determines that the Debtor's value has increased prior to confirmation of the Plan or will increase upon exit from bankruptcy under a confirmed Plan, such value may increase to the benefit of all shareholders, including those creditors receiving shares in exchange for debt."  The same logic applies to the stock to be received by Auctus and any Accredited Investors.

35.     The foregoing suggests the possibility that the Plan is not proposed in good faith to reorganize the Debtor but rather to benefit Auctus, the Accredited Investors, Equity, and holders of Allowed General Unsecured Claims who will receive Secured Convertible Plan Notes

and/or Plan Warrants.  Section 1.48 of the Plan attempts to address such concerns, by imposing a

"Leak Out Restriction" on the shares of Common Stock to be issued under the Plan.  Under

Section 1.48(a), for shares of Common Stock received under Section 4.3(c)(i) of the Plan, which

would be stock distributed to holders of Allowed General Unsecured Claims that are not

committing to provide Cash to the Reorganized Debtor in payment of those claims, there is a

restriction prohibiting the sale of such stock to 33% for the first thirty (30) days after the

Effective Date, 33% during the next thirty days, and 33% during the following 30 days.  For

shares of Common Stock obtained through the conversion of a Convertible Plan Note received

under Section 4.3(c)(ii)(1) of the Plan by holders of Allowed General Unsecured Claims that are

committing to provide Cash to the Reorganized Debtor, the sale of such stock is restricted to

16.6% for each thirty days following the Effective Date through the 180th day after the Effective

Date.  However, the Plan **does not** contain any Leak Out Restrictions for (a) shares of Common

Stock obtained through the conversion of Secured Convertible Plan Notes by holders of Allowed

General Unsecured Claims that are committing to provide Cash to the Reorganized Debtor under

Section 4.3(c)(ii)(2) of the Plan, or (b) shares of Common Stock obtained through the conversion

of Secured Convertible Plan Notes to be received by Accredited Investors, or purchasers of

Common Stock via the Plan Warrants these Accredited Investors are to receive under Section 5.2

of the Plan, for their respective contributions to the Plan, (c) shares of Common Stock obtained

through the conversion of Secured Convertible Plan Notes to be received by Auctus in the

amount of $3.3 million under Section 5.2 of the Plan.

36.     Given the fact that, as discussed above, the viability of the Reorganized Debtor is,

at best, highly speculative given the Debtor's historical inability to raise funding for the

necessary clinical trials, the funds contributed to date and to be contributed by Auctus, and the

incentive of General Unsecured Creditors and Accredited Investors to contribute new money to the Reorganized Debtor in exchange for Convertible Plan Notes, Secured Convertible Plan Notes, and Plan Warrants, the incentive of holders of General Unsecured Claims to vote for the Plan and thereby obtain stock in the Reorganized Debtor is clearly not motivated by the non-existent potential payment to be made by the Reorganized Debtor and the Secured Convertible Plan Notes as those Notes apparently are payable only on their maturity date, 36 months after the Plan Effective Date.  Given the tenuous viability of the Reorganized Debtor, the most likely incentive for Auctus and any other Creditor or Investor to take Secured Convertible Plan Notes is the hope or expectation that the stock price of the Reorganized Debtor's common stock will, prior to the maturity date on the Notes, increase above the exercise price or $0.0004 per share.

37.    The only way to effectively insure that the Plan is proposed in "good faith" for proper Chapter 11 purposes, and not as some kind of penny stock play intended to benefit Auctus and the Accredited Investors Auctus must approve, and existing holders of General Unsecured Claims who finance the Plan, is to modify the Plan to impose meaningful Leak Out Restrictions of at least three years from the Effective Date on all recipients of Common Stock of the Reorganized Debtor.

**D.  The Plan Includes Improper Releases.**

38.    Section 9.3 of the Plan provides:

> DEBTOR RELEASES. NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY, AS OF THE EFFECTIVE DATE,. . .  THE DEBTOR AND ITS CURRENT AND FORMER AFFILIATES AND REPRRENTATIVES AND THE ESTATE SHALL BE DEEMED TO HAVE PROVIDED A FULL, COMPLETE, UNCONDITIONAL AND IRREVOCABLE RELEASE TO (i) THE DEBTOR'S CURRENT OFFICERS, DIRECTORS, AGENTS AND PROFESSIONALS AND (ii) AUCTUS FUNDS, LLC, AND ITS CURRENT OFFICERS, DIRECTORS, AGENTS AND PROFESSIONALS (EACH, A "RELEASED PARTY," AND

COLLECTIVELY, THE "RELEASED PARTIES") AND EACH SUCH RELEASED PARTY SO RELEASED SHALL BE DEEMED RELEASED BY THE DEBTOR AND ITS AFFILIATE AND REPRESENTATIVES AND THE ESTATE FROM ANY AND ALL CLAIMS, CAUSES OF ACTION AND ANY OTHER DEBTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, ACTIONS, REMEDIES AND LIABILITIES WHATSOEVER, WHETHER ACCRUED OR UNACCRUED, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING BEFORE THE EFFECTIVE DATE, AS OF THE EFFECTIVE DATE OR ARISING THEREAFTER, IN LAW, AT EQUITY, WHETHER FOR TORT, CONTRACT, VIOLATIONS OF STATUTES (INCLUDING BUT NOT LIMITED TO THE FEDERAL OR STATE SECURITIES LAWS), OR OTHERWISE, BASED IN WHOLE OR IN PART UPON ANY ACT OR OMISSION, TRANSACTION, OR OTHER OCCURRENCE OR CIRCUMSTANCES EXISTING OR TAKING PLACE PRIOR TO OR ON THE EFFECTIVE DATE ARISING FROM OR RELATED IN ANY WAY TO THE DEBTOR, INCLUDING, WITHOUT LIMITATION, THOSE THAT THE DEBTOR WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT OR THAT ANY HOLDER OF A CLAIM OR EQUITY INTEREST OR OTHER ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT FOR OR ON BEHALF OF THE DEBTOR OR THE ESTATE, INCLUDING WITHOUT LIMITIATION THOSE IN ANY WAY RELATED TO THE CHAPTER 11 CASE OR THE PLAN; PROVIDED, HOWEVER, THAT THE FOREGOING RELEASE SHALL NOT PROHIBIT THE DEBTOR OR THE ESTATE FROM ASSERTING ANY AND ALL DEFENSES AND COUNTERCLAIMS IN RESPECT OF ANY DISPUTED CLAIM ASSERTED BY ANY RELEASED PARTIES; **PROVIDED FURTHER, THAT THE FOREGOING PROVISIONS OF THIS SECTION 6.19(a) SHALL HAVE NO EFFECT ON THE LIABILITY OF THE DEBTOR'S CURRENT DIRECTORS AND OFFICERS, THE DEBTOR'S DIRECTORS AND OFFICERS THAT SERVED IN SUCH CAPACITY AS OF THE PETITION DATE, THE DEBTOR'S PROFESSIONALS, AND THE REPRESENTATIVES OF EACH OF THE FOREGOING THAT RESULTS FROM ANY ACT OR OMISSION THAT IS DETERMINED IN A FINAL ORDER TO HAVE CONSTITUTED GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.** (Emphasis added.)

39.    The revised release in the Plan still releases claims against officers and directors that served in such capacities prior to but not as of the Petition Date and to any officers and directors whose acts or omissions have not yet been determined, by a final order to have

constituted "gross negligence or willful misconduct."   The Amended Disclosure Statement

offers no legal basis for the grant of wholesale third party releases to Actus or its current officers,

directors, agents and professionals from any claim or action, or for the third-party releases of the

Debtor's current officers, directors and representatives from any act or omission that is not

determined in a final order to have risen to the level of gross negligence or willful misconduct.

40.    In *In re Aegean Mar. Petroleum Network Inc.*, 599 B.R. 717 (Bankr. S.D.N.Y.

2019), the Bankruptcy Court stated:

> The Debtors' releases of their own claims will have the effect of
> releasing any derivative claims that creditors or shareholders might have
> filed with respect to the released matters, and the Plan so states.
> It is often the case that a Bankruptcy Court is asked to enforce a debtor's
> own releases by issuing an injunction that prevents third parties from
> asserting claims that belonged to the estate and that were released by the
> debtor, and the Plan in this case includes such an injunction.  These are
> sometimes described as third-party releases or as injunctions against
> third-party claims, but that is not really an accurate characterization of
> what they are. Injunctions of this kind are more properly described as
> injunctions against interference with a debtor's court-approved decisions
> about the disposition of claims that belonged to the debtor.  *See,
> e.g.,* <u>MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville
> Corp.), 837 F.2d 89 (2d Cir. 1988)</u> (confirming that it was appropriate to
> enjoin creditors from pursuing claims that belonged to the debtors
> and  that the debtors had released). Injunctions of this kind do not take
> away claims that belong to third parties; they just enforce the debtors'
> releases of the debtors' own claims.
>
> I have received no objections to the proposed releases of the Debtors'
> own claims, or to the injunction against efforts by third parties to enforce
> claims that belonged to the estate and that are being released by the
> Debtors.

Here, unlike in *Aegean*, as stated at the Disclosure Statement hearing, Objectants do object to the

Releases in the Plan.

**WHEREFORE**, for the foregoing reasons, Objectants respectfully request that confirmation of the Plan be denied, and that the Court grant such other and further relief as this Court deems just and proper.

Dated: Westbury, New York
     September 3, 2020

                                  PRYOR & MANDELUP, L.L.P.
                                  *Attorneys for John M. Desmarais*
                                  *and Tuxis Trust*

By:    */s/ A. Scott Mandelup*
                  A. Scott Mandelup
                  Neil Ackerman
              675 Old Country Road
              Westbury, NY 11590
              Tel.: (516) 997-0999
              Email: asm@pryormandelup.com
                          na@pryormandelup.com